MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

WILLIAM FRENTZEN (CABN LA 24421)
SUSAN BADGER (CABN 124365)
S. WAQAR HASIB (CABN 234818)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-6753
    William.Frentzen@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 14-196 CRB |
| Plaintiff, | UNITED STATES' APPEAL OF MAGISTRATE |
| v. | JUDGE'S PRETRIAL RELEASE ORDER AND MOTION FOR IMMEDIATE REMAND OF |
| KEITH JACKSON, | DEFENDANT JACKSON |
| Defendant. | |

**TO:  KEITH JACKSON, JAMES BROSNAHAN, ESQ; AND THE CLERK OF THE ABOVE-ENTITLED COURT:**

    PLEASE TAKE NOTICE that the UNITED STATES hereby moves the Court for an appeal and reversal of the Magistrate Court's pretrial release order of defendant Keith Jackson.

**INTRODUCTION**

At approximately noon on April 3, 2014, Magistrate Judge Nathanael Cousins ordered defendant Keith Jackson ("Defendant") released to home confinement on a partially secured $250,000 bond. *See* Exhibit A (Conditions of Release and Appearance). The government asked Magistrate Judge Cousins to stay the order of release until Defendant had complied with General Order 55, or at least until April 4, 2014, to permit the government time to prepare an appeal to the district court pursuant to 18 U.S.C. § 3145. The government explained that counsel were scheduled for Grand Jury from 12:30 p.m. to 4:30 p.m. that same afternoon. Magistrate Judge Cousins would only agree to grant a stay until 5 p.m. that day. The government attempted to file a stay with the Duty Judge, Judge Orrick, but Judge Orrick did not have sufficient time to act on the stay and instead indicated that the judge assigned to the freshly indicted case should consider the bail issue. The government hereby appeals Magistrate Judge Cousins's order and seeks immediate remand of Defendant to custody pending trial.

**BACKGROUND**

A.      **Defendant's Charged Offenses**

Along with co-defendants Leland Yee, Defendant's adult son Brandon Jackson, Marlon Darrell Sullivan, and others, Defendant was charged by complaint filed on March 24, 2014, with ten violations of federal law (See Affidavit in Support of Complaint by SA Emmanuel V. Pascua, attached as Exhibit B). Defendant was arrested on March 26, 2014. On April 3, 2014, a Grand Jury returned a Fifty Count indictment charging Defendant with 13 Counts including: (1) conspiracy to distribute narcotics, in violation of 21 U.S.C. § 846; (2) use of interstate commerce facility for the commission of a murder-for-hire, in violation of 18 U.S.C. § 1958; (3) conspiracy to traffic in firearms without a license, in violation of 18 U.S.C. §§ 371 & 922(a)(1); (4) trafficking in firearms without a license, in violation of 18 U.S.C. § 922(a)(1); and (5) using interstate wires in the course of a scheme to defraud citizens of honest services, in violation of 18 U.S.C. §§ 1343, 1346 & 2. The charges against Defendant are of the same nature as those charged in the Complaint that was before the Magistrate Court. The government has been agreeable as to the release of most of Defendant's co-defendants who were arrested in this District.

B.      **Defendant's Bail Hearing**

Defendant made his initial appearance on March 26, 2014, and was initially detained.  Based on the charges against Defendant, pretrial detention is presumed unless rebutted.  18 U.S.C. § 3142(e)(3). The government sought Defendant's pretrial detention based on a concern that the significant exposure to imprisonment would motivate Defendant to flee, and based on a concern that Defendant's willingness to arrange a murder-for-hire and to defraud citizens, and his connections to gangs and weapon dealers in the Philippines posed a serious risk that he would obstruct or attempt to obstruct justice, or threaten, injure, or intimidate a prospective witness or juror.  Pretrial Services conducted a bail study, and was similarly concerned with Defendant's risk of flight and dangerousness to the community.  However, Pretrial Services concluded that these risks might be mitigated through stringent release conditions, including Defendant's release to a halfway house and a secured $250,000 bond.  At the time of the bail study, Defendant had identified three potential sureties: his long-time significant other, Pamela Gilmore, and two Reverends, none of whom had any assets to secure a bond.

On April 1 and April 3, 2014, Magistrate Judge Cousins held bail hearings.  The government argued that given Defendant's willingness to engage in murder-for-hire and connections to violent individuals, the safety of the community required some restraint and monitoring of Defendant's phone communications and that while jail was preferable, at least a halfway house would provide some measure of control.  Magistrate Judge Cousins rejected the Pretrial Services recommendation of release to a halfway house, and chose to release Defendant to home confinement.  Magistrate Judge Cousins did not address the concern over the safety of the community identified by both the government and Pretrial Services, other than to say that he found the presumption of detention rebutted by Defendant's ties to the community – that he was a lifelong member of the community and his significant ties to the community.

By April 3, Defendant had replaced the two Reverends he had proposed for Pretrial Services's bail study with other potential sureties:  Gilmore's father, who claimed to have $50,000 property in Tennessee, and Defendant's mother Annie Scott and Defendant's uncle Sammie Scott, who allegedly together own a mobile home in Texas valued at $50,000.  The government objected to these proposed sureties, noting that there was evidence that Gilmore not only had no property to secure a bond, but was a participant and witness to Defendant's conspiracy to traffic in firearms without a license, and his

1  trafficking in firearms without a license, on March 14 and March 20, 2014. The government noted that
2  Defendant's mother appeared to reside in Texas and had only recently returned to the district shortly
3  before her son's arrest, and that her alleged property was unsuitable to secure a bond because it was
4  mobile and in Texas. The government noted that Gilmore's father and Sammie Scott were out of district
5  and could have little positive controlling effect on Defendant. The government also noted that the
6  documents required under General Order 55 to prove the value and ownership of property used to secure
7  bail had not yet been provided. The government requested that, at a minimum, the Court withhold its
8  decision on release until after the Defendant provided the required information regarding the securing
9  property.

10         Magistrate Judge Cousins did not share the government's concerns over the suitability of the
11  proffered sureties, and because neither Gilmore's father nor Sammie Scott were in court, decided that
12  Defendant's bond could be signed by Gilmore and Annie Scott only, and secured only by the Scotts'
13  Texas mobile home. Magistrate Judge Cousins also indicated that General Order 55, which applies to a
14  secured bond, did not apply to him because even though he was imposing a secured bond in this case, he
15  had the ability to impose an unsecured bond. Instead, he ordered Defendant released on April 3, 2014,
16  and the property posted by April 17, 2014.

17                                         **ARGUMENT**

18         **A.      Standard Of Review**

19         "[A] district court's review of a magistrate's detention order is to be conducted without
20  deference to the magistrate's factual findings." *United States v. Koenig*, 912 F.2d 1190, 1192 (9th Cir.
21  1990).

22         **B.      Defendant Is Presumed A Danger And A Flight Risk As A Matter Of Law**

23         Based on his charged offense of conspiracy to distribute narcotics, Defendant's detention is
24  presumed. The Bail Reform Act of 1984 ("the Act") permits pretrial detention of a defendant without
25  bail where "no condition or combination of conditions will reasonably assure the appearance of the
26  person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e).
27  Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not
28  necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). A finding that

1    a defendant is a danger to the community must be supported by clear and convincing evidence.  18

2    U.S.C. § 3142(f).  A finding that a defendant is a flight risk need only be supported by a preponderance

3    of the evidence.  *Motamedi*, 767 F.2d at 1406.

4              In cases involving violation of 21 U.S.C. § 846 with a potential sentence of 10 years or more, the

5    Act established a rebuttable presumption that a defendant is both a flight risk and a danger to the

6    community.  18 U.S.C. § 3142(e)(3)(A).  The offense charged against Defendant carries a potential

7    punishment of not less than 5 and up to 40 years' imprisonment and thus triggers the presumption.  That

8    presumption exists if there is "probable cause" to believe that the defendant committed a violation of 21

9    U.S.C. § 846.  18 U.S.C. § 3142(e).  The grand jury indictment, as well as the Complaint previously

10   filed, establish "probable cause" and gives rise to the Act's presumptions.  *United States v. Contreras*,

11   776 F.2d 51, 55 (2d Cir. 1985).  Once the presumption is triggered, the defendant has the burden of

12   producing or proffering evidence to rebut the presumption.  *United States v. Hare*, 873 F.2d 796, 798

13   (5th Cir. 1989); *United States v. King*, 849 F.2d 485, 488 (11th Cir. 1988).

14             If the defendant proffers evidence to rebut the presumption, the Ninth Circuit has identified

15   several relevant statutory factors in determining whether pretrial detention is appropriate: (1) the nature

16   and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the

17   defendant's character, physical and mental condition, family and community ties, past conduct, history

18   relating to drug or alcohol abuse, and criminal history; and (4) the nature and seriousness of the danger

19   to any person or to the community that would be posed by defendant's release.  18 U.S.C. § 3142(g);

20   *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986); *Motamedi*, 767 F.2d at 1407.

21             Congress intended that the statutory presumptions would have a practical effect.  *United States v.*

22   *Jessup*, 757 F.2d 378, 382 (1st Cir. 1985).  The presumptions do not disappear when a defendant meets

23   his or her burden of producing rebuttal evidence.  *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir.

24   2008).  The presumptions remain as evidentiary findings militating against release, to be weighed along

25   with other evidence relevant to the factors listed in Section 3142(g).  *Id.*  Indeed, the Act's presumption

26   should be added as a factor that supports pretrial detention under both rationales for detention.  *See*

27   *United States v. Perez-Franco*, 839 F.2d 867, 870 (1st Cir. 1988).

28

## C.   Defendant Has Not Rebutted The Presumptions That He Is Both A Danger And A Flight Risk

Magistrate Judge Cousins erred in finding that this presumption was rebutted by Defendant. Defendant offered nothing more during the hearings than his lack of criminal record and his lifetime residence in San Francisco to rebut the presumption.  The conditions imposed – home confinement with electronic monitoring, $250,000 bond, unsecured but for $50,000, and two sureties, one of whom is a witness to defendant's illegal actions – are woefully inadequate and ensure neither the safety of the community nor defendant's appearance in future proceedings.  The Court provided no rationale for its decision other than that conditions could be fashioned.

Magistrate Judge Cousins failed to properly consider, as required by 18 U.S.C. § 3142, the danger to the community posed by Defendant's release or to fashion adequate constraints to secure the community's safety.  In light of probable cause being found by both the Magistrate Court and the Grand Jury that Defendant engaged in murder-for-hire and firearms trafficking, including from a convicted felon and from a gang member, the risk of obstruction of justice against prospective witnesses and jurors is particularly significant.  Additionally, while Jackson identified some of his potential sources to commit murder-for-hire and to supply weapons, not all of those individuals are in custody and some are still on the streets.

Further, the conditions of the bond that Magistrate Judge Cousins fashioned are wholly inadequate and fail to comply with General Order 55.  The two signed sureties are Pamela Gilmore, Defendant's significant other and a participant and witness to his charged offenses, and Annie Scott, Defendant's mother who until recently resided out of state.  Defendant's bond is secured by a mobile home in Texas supposedly worth $50,000.  But there is currently no documentation to verify that the sureties own this mobile home, that it is real property, or that it is worth what Defendant claims it is worth.  The Magistrate Judge at the hearing openly declared that he was aware of, but not following Local Rule 46-2 and General Order 55.

Importantly, Defendant's detention is warranted not simply by the Section 3142(e)(3) presumptions, but by the factors the Court must consider under Section 3142(g), as detailed in the Affidavit in Support of Complaint by Special Agent Emmanuel V. Pascua.  The following facts establish

Defendant's danger to the community by clear and convincing evidence, and establish his risk of flight by a preponderance of the evidence:

- Defendant was trafficking in firearms without a license, selling many firearms to an FBI undercover employee (UCE 4599) whom he believed to be a member of two criminal organizations (La Cosa Nostra and the Chee Kung Tong), and whom he understood was using the firearms to arm his associates who were manufacturing marijuana at purported grows in Mendocino County.  In other words, Defendant was selling firearms to be used in criminal manners, for narcotics trafficking.  He facilitated providing assault weapons, stolen weapons, and weapons with scratched off serial numbers.  He also brought his son, Brandon Jackson, and Marlon Sullivan ("Sullivan") in on this endeavor, along with others.

- Defendant participated in a conspiracy to traffic in cocaine with Brandon Jackson and Sullivan.  Defendant informed UCE 4599 about his son's trafficking enterprise, and pushed for UCE 4599 to facilitate their enterprise by providing cocaine.  That conspiracy culminated in the defendants bringing $275,000 to purchase 10 kilograms of cocaine at which point Sullivan and then Brandon Jackson were arrested.

- Defendant participated in a proposed murder-for-hire.  Understanding that UCE 4599 was interested in taking out a person who purportedly owed UCE 4599 money, and understanding that defendant Rinn Roeun had proposed to commit the murder-for-hire for $25,000, Defendant told UCE 4599 that "I want to keep that with us" – meaning that Defendant did not want Rouen to commit the murder-for-hire, but wanted his son Brandon Jackson, Sullivan, and their unidentified associates to commit the murder for $25,000.  Defendant also offered co-defendant Barry House as "muscle" to perform "collections" and other acts of violence.  Defendant offered violent services from members of a local street gang as well.

- Defendant committed and solicited honest services fraud in the form of bribery with State Senator Leland Yee and also involving other public officials.  Defendant was actively involved in lying and making misrepresentations for the purpose of funneling illegal campaign contributions into Senator Yee's accounts.  In so doing, Defendant perverted local and State governance.

- While not yet charged, there is also evidence that Defendant facilitated UCE 4599's purchase of fraudulent access devices from co-defendant Sullivan.  Defendant also discussed his ability to obtain fraudulent identification documents.  These incidents are clearly concerning in terms of the ability to flee.

- Also not charged, but fully substantiated by recordings, Defendant facilitated an extortion scheme to try to obtain money through the color of official right.  That, combined with his offers to facilitate "collections" for UCE 4599 through violence demonstrate a dangerous history of attempting to persuade others through unlawful means.

- Defendant is also charged with a conspiracy to illegally sell and import weapons from rebel groups in the Philippines.  Defendant also discussed an alternative international source for weapons with UCE 4599 who is not in custody.  These types of international connections, extremely dangerous weapons, and the fact that one proposed source of supply is a terrorist organization (Moro Islamic Liberation Front) clearly spells out a means to flee and a danger to the community.

- All of these activities were captured on tape in Defendant's own words.  Therefore, while Defendant enjoys the presumption of innocence, the weight of the evidence against him – which must be considered by the Court – is incredibly heavy.

- Defendant faces a lengthy jail sentence that includes mandatory minimum sentences with exposure to 40 years' imprisonment on the narcotics offense, and 20 years' imprisonment per count for the wire fraud offenses.  That would certainly give him reason to flee.  While he does not have a passport, Defendant has nation-wide and internal contacts, on which he drew to commit the charged offenses.

- While it is true that Defendant has no criminal history, this case is very different than the normal one where a defendant is caught committing a single isolated crime and, if he has no criminal history, may be presumed to have messed up once.  Here, as the Complaint and Indictment establish, there is probable cause that Defendant engaged in a wide variety of serious, frequent criminal behavior spanning the course of many years.  While he has not

previously been arrested or convicted, there is unquestionably probable cause to believe that Defendant is not a one-time offender but a one man crime wave.

- This Court should reject Defendant's claim that his familial ties rebut the presumptions that no set of conditions will reasonably assure his appearance in court proceedings and secure the safety of the community. Defendant brought his own son Brandon Jackson into criminal activity after criminal activity and literally pleaded with UCE 4599 to commit crimes with his son. Furthermore, Defendant introduced his son to not only UCE 4599, but also to co-defendant Raymond Chow, the Dragonhead and leader of the Chee Kung Tong. Brandon Jackson was ordered detained by the District of Connecticut for his removal to this Court.

- Defendant has a history of employment. That employment in political consulting has largely been exposed as illegal fund raising and efforts to drain public contracts with improper influence. Defendant Jackson's work history should not be a basis for his release as it is through his "employment" that he committed much of his fraud.

- It is through some of Defendant's own conversations that his character and history should be judged. Those include the following:

    (1) In reference to a source of supply for weapons on January 2, 2014:

    UCE 4599: But he said I can get tanks?

    KJ: yeah, I can get tanks, I get whatever you want. He said, whatever you do, it has to go through the Philippines, Thailand.

    UCE 4599: I'd rather go through the Philippines if you don't mind dude.

    KJ: they been, they been funding the rebels with that shit.

    (2) In reference to setting up his son Brandon Jackson with cocaine from UCE 4599 on December 17, 2013:

    UCE 4599: you know, I know Marlon's running with this, but uh, he's, in my eyes [Brandon's] an equal partner.

    KJ: yeah, no, yeah.

U.S. APPEAL OF RELEASE AND MOT. FOR REMAND
CR 14-196 CRB

1  UCE 4599: he's an equal partner right?

2  KJ: yeah, he's getting 50-50.

3  UCE 4599: alright, alright, if it's 50-50 then yeah, alright, as long as you tell me that.

4  KJ: I told them, they got to pay my percentage too.

5  UCE 4599: they got to hook you up dude cause I got to tell you, it's a finder fee.

6  (3) In reference to purchasing weapons through Senator Yee's source on December 13,

7  2013:

8  KJ: You know his Filipino guys say hey man, they moving shit out of the Philippines all

9  day long.

10  UCE 4599: Like, like what are they moving man?

11  KJ: heavy, heavy

12  UCE 4599: heavy artillery?

13  KJ: yeah, cause they, you know, they got the guerillas fighting with the uh . . . .

14  UCE 4599: that rebel group?

15  KJ: yeah, they supply all the weapons.

16  *United States v. Hir*, 517 F.3d 1081, is instructive to this case. In *Hir*, the defendant was charged

17  with conspiring to provide and providing material support to terrorists, contributing goods to a global

18  terrorist and false statements. The terrorist organization which he was supporting, coincidentally, was

19  the Moro Islamic Liberation Front ("MILF") in the Philippines, the same organization that Defendant

20  Jackson sought to support by purchasing their weapons. Hir was ordered released by the Magistrate

21  Court, then ordered detained by the District Court Judge. Hir appealed his detention to the Ninth

22  Circuit. The Ninth Circuit upheld the detention on the basis of danger to the community. Unlike

23  Defendant Jackson, Hir was not also charged with drug trafficking, firearms trafficking, murder-for-hire,

24  and public corruption. In addressing the release conditions proposed by Hir and the Pretrial Services

25  office, including (1) no firearms, (2) no communication with the Philippines, (3) GPS monitoring, (4)

26  ban on internet usage, (5) reporting to Pretrial, (6) no sending money or packages overseas, and

27  (7) surrender of passport – the Ninth Circuit noted the flaws. "Although these proposed conditions of

28  release are strict, they contain one critical flaw. In order to be effective, they depend on [Defendant's]

good faith compliance." *Id.* at 1092.  The Ninth Circuit quoted the First Circuit, stating "the conditions as a whole are flawed in that their success depends largely on the defendant's good faith – or lack of it. They can be too easily circumvented or manipulated." *Id.*  The Ninth Circuit went on to explain that Hir's charged conduct showed his unwillingness to abide by the law already.  *Id.* at 1093.  Defendant Jackson's situation is comparable, but far worse than the situation facing the defendant in *Hir.*  Defendant has committed not just offenses regarding support for terrorists, but has engaged in a laundry list of other offenses including crimes of violence.

> **D.**     **Defendant Jackson Should Not Have Been Released And Should Be Remanded Pending This Appeal**

The premature release of Defendant, before the government had a real chance to appeal to the district court that is assigned to the case, has already impaired the government's ability to secure his attendance at court proceedings and to secure the safety of the community.  Moreover, premature release flouts this court's rules and orders regarding conditional bonds secured by property.

While the government is seeking to appeal, it is also seeking that the Court remand Defendant to custody.  That is in order because Defendant's release at 5 p.m. on April 3, 2014, clearly violated Local Rule 46-2 and General Order 55.  Local Rule 46-2 states that a defendant's conditioned release may be based "upon the deposit of cash (i.e., currency, check or money order) with the Court," or "the deposit of other security (e.g., deed of trust) with the Court."  Local Rule 46-2.  Furthermore, "[w]hen the release of a defendant is conditioned upon the deposit of other security (e.g., deed of trust) with the Court, such deposit *shall* be made . . . in accordance with the 'Guidelines in Posting Real Property as Bail in Lieu of Cash/Surety Bond; Surrendering Passports(s)."  Local Rule 46-2 (emphasis added).  These Guidelines are in General Order 55, which pertain only to "real property."  General Order 55 at 1.  Thus, under the pertinent rules, it appears that a secured bond must be secured by either cash or real property.

Further, it is unclear whether the Scotts' Texas mobile home has any value, is owned by them, or whether it includes the land upon which the vehicle is situated.  None of the bond documentation the government has received records any address for the mobile home.  *See* Exhibit A (Conditions of Release and Appearance).  The government's own preliminary research shows that there is no real

property registered to Annie Scott in Texas.  *See* Exhibit C (Lexis Real Property Search Results).

Indeed, in her December 29, 2011, filing for Chapter 7 bankruptcy in the Northern District of California

(Case No. 11-34599), Annie Scott indicated that she owned no real property and resided at Jackson's

California Street address.  *See* Exhibit D (Annie Scott's Voluntary Petition of Bankruptcy).  Preliminary

research also indicates that Sammie Scott has $38,806 in federal tax liens against him. *See* Exhibit E

(Federal Tax Liens Against Sammie Scott).  If the mobile home refers only to the vehicle, it may not

qualify as real property, suitable to support a pretrial release bond.  *See Polar Tankers, Inc. v. City of*

*Valdez, Alaska*, 557 U.S. 1, 13 (2009) (observing that city of Valdez taxed mobile homes differently

depending on whether they are personal property or used as home).  As was pointed out to the

Magistrate Court, the problem with the posting of a mobile home is that it is mobile and, thus, easy to

move and easy to allude collection by the government – if there is even any equity in the home.

Even if the Texas mobile home were established as real property, it may not be suitable to

support a pretrial release bond.  General Order 55 states that "certain documents" showing "that the

property has enough equity to support its portion of the bond amount" and "that the person(s) posting

the property is/are the true and only owner(s)" "will be *required* to prove the value and ownership of the

property and to secure the court's interest."  General Order 55 at 1 (emphasis added).  The documents

should be "prepared by the defense, presented to the government for approval and the lodged with the

court."  *Id.*  Thus far, Defendant has submitted no documentation regarding the Texas mobile home.

There is only his mother's representation that she and Defendant's uncle own the property and that it is

worth $50,000.  That is clearly insufficient.  There was also discussion about a property in Tennessee,

supposedly owned by Gilmore's father.  Preliminary investigation by the government shows minimal

equity in the presumed property – but that surety was not required to sign and that property was not

required posted.

Defendant's release is conditioned on a secured bond.  Therefore, his release was premature

without some substantiation in accordance with General Order 55 that the proposed security for his bond

– the Texas mobile home – exists and is unencumbered.  The many questions arising about the

ownership and true nature and value of the property is exactly why the Court should be following the

Local Rule and the General Order and the Magistrate's early release without that information in this case

was erroneous.  As noted above, however, the government persists in its view that, like the defendant in *Hir*, Defendant should be detained as a flight risk and a danger to the community.

The government respectfully submits that Defendant should be remanded to custody immediately and that the Magistrate's Order of Release should be reversed pending trial.

Date:  April 3, 2014

Respectfully submitted,
MELINDA HAAG
United States Attorney

/s/ William Frentzen
WILLIAM FRENTZEN
SUSAN BADGER
S. WAQAR HASIB
Assistant United States Attorneys

**[PROPOSED] ORDER**

Pursuant to the request of the United States, [IT IS HEREBY ORDERED that the Order of Magistrate Judge Nathanael Cousins setting conditions of pretrial release for Defendant Keith Jackson is hereby reversed.]

[And,] IT IS HEREBY ORDERED, that defendant Jackson be report to the U.S. Marshals and be remanded to custody immediately.

DATED:  April _____, 2014

_____
HON. CHARLES R. BREYER
United States District Judge