MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

WILLIAM FRENTZEN (LABN 24421)
SUSAN BADGER (CABN 124365)
S. WAQAR HASIB (CABN 234818)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6959
    FAX: (415) 436-6753
    william.frentzen@usdoj.gov
    susan.badger@usdoj.gov
    waqar.hasib@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 14-0196 CRB (JCS) |
|     Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT LI'S MOTION TO RECONSIDER DETENTION ORDER |
| v. | |
| KWOK CHEUNG CHOW, et. al. | Date: September 5, 2014 |
|     Defendants. | Time: 9:30 a.m. |
| | Court: Hon. Joseph C. Spero |

U.S. OPP. TO RECONSIDERATION
CR 14-0196 CRB

TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................1

    1.    The Shotgun in Defendant's Home.........................................................................1

    2.    The Sheriff's Ballistic Vest......................................................................................4

    3.    "Context" ..................................................................................................................6

    4.    Inaudible Recordings ...............................................................................................8

    5.    Statements, Actions, and History Left Unaddressed by Defendant Li's Motion to Reopen ..................................................................................................................8

CONCLUSION.....................................................................................................................10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## FEDERAL CASES

*United States v. Hatcher*, 323 F.3d 666 (9th Cir 2003) ................................................................. 5

*United States v. Madoch*, 149 F.3d 596 (7th Cir. 1998) ................................................................ 5

*United States v. Montgomery*, 384 F.3d 1050 (9th Cir. 2004) ....................................................... 5

*United States v. VanPoyck*, 77 F.3d 285 (9th Cir. 1996) ............................................................... 5

*Watson v. Albin*, 2008 WL 2079967  (N.D.Ca. 2008) ................................................................... 5

## FEDERAL STATUTES

18 U.S.C. § 922(g) ........................................................................................................................ 2

**INTRODUCTION**

Defendant Li opposed the government's motion to detain and selected a date for his detention hearing. At the hearing, which took place on April 8, 2014, this Court gave defendant time to be heard – so long was defendant heard, in fact, that the Court eventually made the point that the defendant was repeating his arguments. Transcript at 17. Now, defendant requests that this Court reconsider its prior Order to detain. Defendant claims that the Court should reconsider because there is some new information not previously available to the defendant. Unfortunately for defendant, to the extent there is any new information, it leans heavily in favor of detention, not release. Despite defendant's efforts to contort the facts and procedure of this case in his effort to accuse the government of hiding and misrepresenting facts from the Court, he is flat out wrong. There is no basis for reconsideration here but, should the Court reconsider, it should be even more concerned about defendant's danger to the community and risk of flight than at the prior hearing. In part, that is true because defendant has knowingly submitted false declarations to this Court in his effort to gain release.

**ARGUMENT**

    1. <u>The Shotgun in Defendant's Home</u>

Defendant raises one and only one accurate point in his motion to reconsider this Court's Order of Detention. There is an owner of the residence rented by defendant who has claimed ownership of the shotgun in the defendant's residence. Doug Walker has informed the defendant and the government that he claims ownership of the shotgun found at defendant's residence.[1] Unfortunately for defendant, however, the matter does not end there.

Despite defendant's efforts to claim misrepresentation on the part of the government, the government never misrepresented any facts to the Court. During the detention hearing on April 8, 2014, at the tail end of the government's lengthy proffer, government counsel stated "let me just conclude with when the search was conducted on March 26th of 2014 in Mr. Li's residence, we recovered a 12-gauge shotgun. A ballistic vest was found in a vehicle which I understand to be his wife's vehicle. And – I'm going now back into the residence. Sorry. My apologies – 87 marijuana plants." Tr. at 9. That

---

[1] Mr. Walker will apparently not provide a declaration, but the government has interviewed Mr. Walker and agrees that he claims ownership of the shotgun found in defendant's residence.

U.S. OPP. TO RECONSIDERATION
CR 14-0196 CRB                                  1

statement remains as true today as it was during the hearing on April 8, 2014.[2]

Of course, if government counsel had known on April 8, 2014 that the owner of the residence had claimed ownership of the shotgun in the residence, that could have mitigated the shotgun and government counsel would have provided that information to the Court. That information, however, was not known to government counsel. The detention hearing took place shortly after the March 26, 2014 search of more than 30 locations by approximately 400 federal agents, interspersed with other detention hearings, initial appearances, and grand jury sessions, and while a massive amount of evidence was still being processed by the agents and being communicated to the case agents and, eventually, to government counsel. That Mr. Walker claimed ownership of the shotgun was actually not known to government counsel until after the defendant filed his current motion to reconsider the Court's detention order. Shortly after the search of the defendant's residence, Mr. Walker did claim to two FBI agents and one FBI employee – not an agent – that he was the owner of the shotgun. Unfortunately, that information was not filtered through to the investigating FBI case agents until weeks after the hearing. The first interview of Mr. Walker by a knowledgeable case agent was conducted on April 25, 2014, and listed in an FBI 302 record of interview not seen by government counsel until after defendant's motion was filed. The government concedes that the government, in the global sense, did have information that Mr. Walker claimed to own the shotgun, but submits that for understandable reasons the information did not reach the core trial team until after the hearing. Upon review of the full matter, however, the information should not cause the Court to reconsider defendant's detention.

The nature of the information regarding Mr. Walker is far less important than defendant would have the Court believe. First, the issue with a felon, narcotics manufacturer, and dealer like defendant Li is not **ownership** of a firearm, it is **possession** of a firearm. See, e.g., 18 U.S.C. § 922(g) and 924(c) (criminalizing possession of firearms, regardless of ownership). The government never described defendant Li to the Court as the owner of the shotgun. What remains absolutely true is that defendant undoubtedly had a shotgun in a residence that was under his dominion and control and, therefore, in his possession regardless of who was the legal owner of the shotgun. Whether defendant knew of the

---

[2] The only portion that turned out to be factually inaccurate is that there were only 81 marijuana plants, rather than 87 marijuana plants in the Lis' residence.

U.S. OPP. TO RECONSIDERATION
CR 14-0196 CRB                                          2

1  shotgun is obviously a different question that remains unanswered to this point and is unlikely to be
2  answered credibly for the reasons below.

3        Second, by defendant's own description, Mr. Walker is of questionable credibility on this or any
4  other point. According to a jail call on April 6, 2014 – two days prior to the detention hearing – between
5  defendant and his wife, Mimi Li, Mr. Walker was well aware of the electricity configuration of the
6  residence. That configuration is significant because the house was wired for defendant's indoor
7  marijuana grow. As the Court is undoubtedly aware from its long experience with search warrants and
8  other cases, wiring electricity in a manner for a marijuana grow is a telltale sign for such activities.
9  Defendant told his wife: "He [Mr. Walker] wants to sit there and point fingers [about the electricity on
10 the house] for something that he knew what was going on." Later in the conversation, defendant stated,
11 in connection with the electricity to the house, that his wife should tell Mr. Walker that "You [Mr.
12 Walker] knew what he [defendant] was doing there, you approved of it." Then defendant described that
13 it would only cost about $200 to fix the electrical problem.

14       Sure enough, there was a marijuana grow in defendant's residence and the electricity had been
15 rigged for that grow. That Mr. Walker was, by defendant's own words, aware of the grow makes his
16 leaving of a firearm in that residence highly suspect and gives him an understandable reason to claim
17 that the firearm had nothing to do with defendant and his activities in the residence. One also has to
18 question a person leaving a firearm in the home of another person – especially people with children like
19 the Lis – and not notifying the person that they were leaving the firearm. The shotgun was apparently
20 recovered with other items, unsecured, in a crawlspace of the home. Who leaves a shotgun in another's
21 home without commenting that they and their children might want to be cautious about the shotgun?
22 This is especially true if the person leaving the shotgun knows that the occupant of the house has a drug
23 operation ongoing in the house.

24       That defendant would direct the Court to a source like Mr. Walker as exonerating him should be
25 of substantial concern to the Court. That defendant will say or do anything to try to get out of jail should
26 give the Court great pause about releasing him. If a person cannot be trusted to give the Court straight
27 information, that person cannot be trusted to comply with the Court's conditions and directions. And the
28 information provided – that Mr. Walker claims ownership of the gun – does nothing to cut against the

U.S. OPP. TO RECONSIDERATION
CR 14-0196 CRB                                                                         3

1 overwhelming showing made at the hearing that the defendant should be detained. But it gets much
2 worse for defendant.

### 2. The Sheriff's Ballistic Vest

During the course of the detention hearing, the government pointed out that there was a ballistic vest recovered from a vehicle belonging to defendant's wife. Again, that description is as true today as it was during the detention hearing. Defendant, in his motion, provides an unbelievable tale regarding how the vest landed in the car and how his wife did not bother to mention that fact to defendant's counsel until after the hearing. It turns out that, according to defendant, defense counsel may well have known about the ballistic vest before or during the hearing, as will be discussed further below. Giving defendant and his counsel the benefit of the doubt, however, the story currently being sold to this Court defies all logic.

According to defendant's collective declarations, a member of the San Francisco County Sheriff's Office decided that he wanted to leave a ballistic vest belonging to the Sheriff's Office at the work place of Ms. Li because he didn't want it in his car. Then, when the Officer's wife did not bring the vest home, it somehow made sense for the defendant's wife to put the ballistic vest in her vehicle. They then left the ballistic vest in that vehicle for weeks and the Officer decided he did not need it because he had another vest. This story, on its face, strains credulity even if Ms. Li and the Officer were credible. They are not, however, credible sources on this point according to the defendant and his wife's own versions of events.

During the course of the undercover investigation, defendant frequently described to UCE 4599 that he had a good friend who worked in the Sheriff's Office. Defendant told UCE 4599 that the Officer had been a member of defendant Chow's organization when the Officer was younger. Defendant described the individual as "Mike" – the same first name as the Officer who has now filed a declaration. Defendant described how one night he and the Officer were intoxicated and got into an automobile accident, with the Officer driving drunk, and they were hospitalized. During the covert investigation, the government attempted to learn whether the Officer being described by defendant Li really existed.

During the investigation, defendant tried to convince UCE 4599 to meet with the Officer. The Court will recall that this was during a period of time when defendant believed that UCE 4599 was an

organized crime figure. When UCE 4599 told defendant that he did not want to meet anyone who was law enforcement – primarily out of a concern by the agent that the Officer, as a member of law enforcement, might coincidentally know the UCE or know someone who did know the UCE, thereby compromising the investigation – the defendant stated that the Officer was trustworthy. Trustworthy in that context meant that the Officer would not do anything to stop or arrest defendant and UCE 4599 in connection with their illegal businesses.

True enough, the government has now located records showing that the Officer who filed the declaration for defendant was in a serious traffic accident where he flipped his car, and admitted that he had been drinking that night. *See,* Exhibit 1, attached. Defendant was present in the car with the Officer, although defendant's name was misspelled in the report. Defendant told UCE 4599 that they had covered up the incident so that the Sheriff's Officer did not get into any trouble. Defendant further described the Officer to UCE 4599 as an ex-gang member who had previously assisted defendant with his gang activity.

In a recorded jail telephone conversation between defendant and Mimi Li, after the hearing had taken place on April 8, 2014, defendant and Ms. Li complained about the performance of the attorneys for defendant during the hearing. Defendant told Ms. Li that he had told his defense counsel about the ballistic vest, and that he only used it to bounce. While describing the hearing, defendant stated to Ms. Li: "And then the bullet proof vest, I told them I use that to bounce. Like, I don't know why she didn't say nothing. Like she was just reading off of paperwork, right?"[3] While the government will not ascribe the same ill intentions to defendant's counsel as the defense has ascribed to the government, it would appear without a doubt that at least defendant was well aware of the ballistic vest at the time of

---

[3] The conversation was on a recorded line of the Alameda County Jail. Thus, there was no spousal privilege, as the recording clearly and loudly announced that it may be monitored and recorded. There was no attorney-client privilege as the defendant was not conversing with his counsel, but with a third party, his wife, over the same announced and recorded line. *United States v. Montgomery,* 384 F.3d 1050, 1056 (9th Cir. 2004)("the [marital communication] privilege … applies only to confidential communications, *i.e.* those not made in the presence of, or likely to be overheard by, third parties."); *United States v. VanPoyck,* 77 F.3d 285, 290-91 (9th Cir. 1996)(where inmate knew of monitoring policy, "no prisoner should reasonably expect privacy" in those circumstances): *United States v. Madoch,* 149 F.3d 596, 602 (7th Cir. 1998)(no marital privilege for recorded jail calls); *United States v. Hatcher,* 323 F.3d 666, 674 (9th Cir 2003)("presence of the prison recording device destroyed the attorney-client privilege."); *Watson v. Albin*, 2008 WL 2079967 *3-4 (N.D.Ca. 2008) (no marital privilege where prisoner knows jail calls were recorded)(unpublished); .

U.S. OPP. TO RECONSIDERATION
CR 14-0196 CRB                                5

his hearing and that he claimed to have told his lawyers about it. It also seems clear that, at a minimum, the declaration filed by Ms. Li in support of the motion for reconsideration was false, was known by both her and defendant to be false when it was made and filed, and that the declaration by the Sheriff's Department Officer was known by defendant to be false. It should also be noted that Ms. Li was interviewed by FBI agents during the search on March 26, 2014, and she stated that both she and defendant used the car that the vest was found in. This useful information was not known by government counsel at the detention hearing.

After receiving the defendant's motion, the government interviewed the Officer. He has admitted to having an old relationship with defendants Li and Chow that included paying Chow to stop gang members from harassing the Officer during the 1990s. He has admitted to an ongoing relationship with defendant Li. He admitted that defendant asked to borrow a ballistic vest and that he offered it to defendant, but then denied that he ever did provide it. The Officer claimed that he went to Mimi Li's workplace after work in the afternoon; Ms. Li told FBI agents that the Officer came to her workplace in the morning that day. The Officer claimed that he dropped off the vest so that he could go drinking with friends. When pressed, he stated it was to go drinking with one friend. When pressed further, he claimed he could not remember who the friend was. The wife of the Officer claimed that she went to the hair salon on a school day. The date provided by Mimi Li was February 2, 2014, a Sunday.

In short, the declarations provided by the defendant are incredible and inconsistent because they are false. According to the defendant himself, it would appear that the Officer and defendant's wife are highly compromised and should be given minimal credibility by this Court. It also is clear that defendant filed declarations from his wife and the Officer that he knew were false. Again, defendant's efforts to weave illogical stories with compromised witnesses demonstrate that the defendant is not straight with the Court and cannot be trusted on release.

### 3. "Context"

Defendant next argues that the government accurately reported statements by defendant Li during the hearing, but that "the government took Mr. Li's allegedly 'violent' statements out of context." Defendant falsely goes on to allege that "the government mischaracterized Mr. Li's statements and took them out of context in an attempt to convince the Court that Mr. Li uttered these statements seriously."

U.S. OPP. TO RECONSIDERATION
CR 14-0196 CRB                                                  6

The government categorically denies the baseless accusations that it made any efforts to mislead the Court.  Should the Court seek to reopen the hearing on this basis, the government would be happy to provide each and every recording and FBI 302 report of each of the defendant's statements for the Court so that the Court can evaluate them for itself.  Upon such a review, in fact, the government is confident that the Court would be even more inclined to detain defendant.

Contrary to defendant's suggestion otherwise, most of defendant's statements were not made in a joking manner.  Should the Court listen to them, it will hear that defendant was boasting and serious about several of his chilling stories and clearly still angry about some of his described victims or intended victims.  And the notion that it was the undercover agents who initiated the discussions about committing violence against others through their own stories of violence is false.  At the dinner on March 29, 2012, as the undercover agents posing as organized criminals from New Jersey were discussing the chaotic nature of traffic in San Francisco and a pedestrian inexplicably stepping into traffic, it was defendant who described – not in a joking manner at all – intentionally running over a pedestrian who stepped in front of him in Los Angeles.  Defendant Li then discussed several different instances of his road rage leading to violent encounters.  That kicked off the discussions of violence that defendant Li engaged in throughout the night and those conversations were consistently led by defendant Li.  Notably, there was one portion of the conversation during which the undercover agents emphasized to defendant Li how important it was to them that he **not** become engaged in any violence because that type of conduct could draw unwanted attention to their illegal business, attract law enforcement attention, and be bad business.  The undercover agents had this conversation with defendant Li out of concern and fear that Li might actually commit some act of violence before he could be arrested.  The conversation was intended as an effort to steer him not to commit any further acts of violence.

Even if defendant had accurately characterized his conversations in his motion – and he did not – he somehow believes that because he occasionally laughed about the horrific violence he described, that makes his a better case for release.  In truth, that at times he laughed about the violence that he described having committed and wanted to commit makes his situation worse.  He did not describe violence as a necessary part of doing illegal business or as an unfortunate occurrence.  Rather, he bragged about what

violence he had done, described more violence that he would like to commit, and laughed about some of it. Defendant even described some of it as almost uncontrollable, as acts that he felt compelled to take because he was messed up in the head. That defendant's counsel thinks this is mitigating is confounding. The fact is that laughing about the commission of violence is a sign of a lack of remorse and empathy and an indicator of dangerousness.

Finally, defendant draws a false equivalency between himself and the undercover agents who were involved in the conversations. Those agents were not sitting down with defendant as federal law enforcement agents. They sat down with the defendant playing a role, or legend, of sophisticated organized criminals from New Jersey. That they did not display horror at the descriptions of violence by defendant is not mitigation for defendant when they were portraying hardened criminals and defendant was being himself. This portion of defendant's argument is simply nonsensical.

### 4. Inaudible Recordings

To the extent that defendant Li takes issue with statements by defendant Li and by defendant Pau regarding Li's violent role as "inaudible," that cannot be the basis for an argument that the government has mischaracterized anything. During the course of the investigation, UCE 4599 documented his interactions with the defendants through recordings and through FBI 302 reports of interview. That defendant Li considers a few of the statements to be "inaudible" does not mean that the statements did not occur and that UCE 4599 will not testify to those statements at trial.

Because much of defendant's motion consists of nothing more than picking at minor details of defendant's statements, if the Court is inclined to reopen the hearing on the basis of defendant's current arguments, the government respectfully submits that the Court should listen to the recordings and gauge for itself the seriousness of the threat of violence to the community posed by defendant Li. The government would be happy to supply all of the recordings to the Court should the Court believe it necessary.

### 5. Statements, Actions, and History Left Unaddressed by Defendant Li's Motion to Reopen

It speaks volumes that there remain many statements made by defendant Li and argued by the government at the detention hearing that defendant does not quibble with or contest in his present motion. Importantly, those statements include the two statements that the Court specifically pointed to

U.S. OPP. TO RECONSIDERATION
CR 14-0196 CRB                                    8

in finding that defendant should be detained. The only statements that the Court expressly pointed out in the detention hearing were (1) "He bragged that he was the head of enforcement for the CKT," and (2) "wanted to get rid of the bugs." Tr. at 18. In defendant's lengthy motion, he does not contest either of those two statements, nor does he claim that either statement was taken out of context. Significantly – and this was not raised by the government at the initial hearing – the individual that defendant discussed when he stated he needed to "get rid of the bugs" was subsequently murdered in a still unsolved homicide.

Of course, defendant's motion also does nothing to mitigate any of the other reasons for the Court to detain defendant. Tr. at 17-19. His criminal history has not changed. The evidence showing that he participated in sales of firearms and an additional ballistic vest to the undercover agent has not changed.

Defendant remains a multiple convicted felon after engaging in acts of arson, robbery, and theft of interstate shipments, as the Court noted at the hearing. Tr. at 18. He has committed multiple prior violations of court-imposed conditions. *Id.* Significantly, this remains a case with a presumption in favor of detention. It remains the fact that defendant was previously detained in federal court when facing charges far less significant than those he now faces, and prior to his most recent felony conviction. There remains probable cause to believe that he provided weapons and a ballistic vest to an undercover agent who he believed was a criminal and was utilizing the firearms for illegal purposes. *Id.* There remains probable cause to believe that the defendant participated with fellow members of his gang in laundering of over a million dollars in cash. *Id.* He still bragged on being head of enforcement for the CKT and was heard stating that he wanted to get rid of the bugs. *Id.* The Grand Jury has found probable cause to bring additional charges against defendant since the original hearing, to include the RICO conspiracy.

In addition, the Court now knows that in support of his efforts to gain his release, defendant has furnished information from a landlord the defendant himself knew to be compromised. Defendant has also provided false declarations from an apparently compromised Sheriff's Officer and from defendant's wife. It would make a mockery of the system for the Court now to vest its trust in the defendant by releasing him to comply with conditions after he tried to defraud this Court.

U.S. OPP. TO RECONSIDERATION
CR 14-0196 CRB                                                  9

**CONCLUSION**

The government respectfully submits that the Court should deny defendant's motion without any further hearing.  In the alternative, the government respectfully submits that, if the Court intends to rely on any declarations filed by defendant – given their compromised nature – those witnesses should be subpoenaed to testify under oath and subject to cross-examination by the government.  Finally, the government respectfully submits that, should the Court order a hearing in reliance on defendant's erroneous allegations of "misrepresentation" by the government, it should listen to the recordings of statements and review the FBI 302s of those statements itself.

Dated:  August 22, 2014

MELINDA HAAG
United States Attorney

By:      _____/s/_____
WILLIAM FRENTZEN
SUSAN BADGER
S. WAQAR HASIB
Assistant United States Attorneys