WINSTON Y. CHAN, SBN 214884
  wchan@gibsondunn.com
VANESSA A. PASTORA, SBN 277837
  vpastora@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

JOANNA L. POWELL, SBN 294427
  jpowell@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: 650.849.5300
Facsimile:  650.849.5333

Attorneys for Andy Li

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>    v.<br><br>Andy Li,<br><br>    Defendant. | CASE NO. CR 14-196 CRB (JCS)<br><br>**DEFENDANT'S REPLY TO UNITED STATES' OPPOSITION TO MOTION TO REOPEN DETENTION HEARING AND RECONSIDER DETENTION**<br><br>**Hearing:**<br>Date:        September 5, 2014<br>Time:       9:30 AM<br>Judge:      Hon. Joseph C. Spero |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................. 1

II. ARGUMENT ........................................................................................................................ 2

    A. The Shotgun Belonging to Mr. Walker ..................................................................... 2

    B. The Ballistic Vest Belonging to Sgt. Kim .................................................................. 5

    C. Mr. Li's Statements At The March 29, 2013 Dinner Do Not Indicate A Propensity To Commit Violent Acts .......................................................................... 9

    D. Other Audio Recordings Similarly Do Not Support The Government's Claims Regarding Mr. Li's Dangerousness ......................................................................... 11

    E. Neither Mr. Li's Charges Nor His Criminal History Support A Finding Of Dangerousness .......................................................................................................... 12

III. CONCLUSION .................................................................................................................. 12

# TABLE OF AUTHORITIES

Page

**Cases**

*United States v. Adams*,
    794 F. Supp. 2d 989 (S.D. Iowa 2011) .................................................................................. 3

*United States v. Patriarca*,
    948 F.2d 789 (1st Cir. 1991) ................................................................................................. 9

*United States v. Salerno*,
    481 U.S. 739 (1987) .............................................................................................................. 4

*United States v. Tucker*,
    641 F.3d 1110 (9th Cir. 2011) ............................................................................................... 3

**Statutes**

18 U.S.C. § 3142(f) ....................................................................................................................... 1

**Rules**

N.D. Cal. Local Civ. R. 7-5(a) ...................................................................................................... 6

N.D. Cal. Local Crim. R. 47-2(b) ................................................................................................. 6

I. **INTRODUCTION**

On August 6, 2014, defendant Andy Li ("Mr. Li") filed a Motion to Reopen his Detention Hearing and Reconsider Detention ("Motion") pursuant to 18 U.S.C. § 3142(f), which authorizes a judicial officer to reopen a detention hearing in light of new information that has a material bearing on a defendant's dangerousness. 18 U.S.C. § 3142(f). In its Opposition to Defendant Li's Motion to Reconsider Detention Order ("Opposition"), filed on August 22, 2014,[1] the government concedes that new, material information exists that was not known at the time of Mr. Li's initial hearing. It acknowledges that Mr. Li's landlord, Doug Walker ("Mr. Walker"), claims ownership of the shotgun found at Mr. Li's residence. Opp. at 1:17-19. Government counsel further states that had it known this information—which it describes as "mitigat[ing]"—at the time of the original detention hearing, it would have provided that information to the Court. Opp. at 2:2-4. Mr. Li's Motion to reopen his detention hearing simply does what the government agrees should be done: provides the Court with new, mitigating information that has come to light since the Court ordered his detention.

Rather than address this mitigating information, the government instead attempts to distract the Court by introducing allegations of irrelevant and unrelated events. It also desperately accuses Mr. Li of attempting to defraud the Court and makes unsupported factual contentions intended to cast doubt on the credibility of declarants who submitted declarations in support of Mr. Li's Motion. However, the government does not, because it cannot, deny these declarants' fundamental claims. It does not refute the facts that the shotgun found in Mr. Li's residence belongs to Mr. Walker, that the ballistic vest found in Mimi Li's ("Ms. Li") vehicle belongs to San Francisco Police Department Sergeant ("Sgt. Kim"), and that Mr. Li made allegedly violent comments in jest. Despite the government's attempts to obfuscate the issues raised by Mr. Li's Motion by calling him, his wife and a fellow law enforcement officer liars, the underlying facts of Mr. Li's Motion requesting that the Court reconsider his detention are simple: this Court relied erroneously on Mr. Li's knowing

---

[1] The defense notes that under Local Criminal Rule 47-2(d), "Any opposition to a noticed motion shall be served and filed not more than 7 days after the motion is filed." The government did not file a motion extending time to oppose Mr. Li's Motion, and did not file its Opposition brief until August 22, 2014, 16 days after Mr. Li filed his initial Motion.

possession of a shotgun and ballistic vest, and this Court was not provided the innocuous context of Mr. Li's recorded statements. These facts weigh strongly in favor of Mr. Li's pretrial release. Therefore, in accordance with 18 U.S.C. § 3142(f), the Court should reopen Mr. Li's detention hearing and reconsider his detention.

## II.     ARGUMENT

### A.     The Shotgun Belonging to Mr. Walker

In his Motion, Mr. Li informed the Court that he was not aware that there was a shotgun at his residence, or that a shotgun was recovered by the arresting agents, until the time of his detention hearing. Mot. at 5:8-10. He further informed the Court that, after his detention hearing, he learned that the shotgun found at his residence belonged to Mr. Walker. Pastora Decl. ¶ 6. In its Opposition, the government acknowledges that it has spoken to Mr. Walker, and that Mr. Walker claims ownership of the shotgun. Opp. at 1:17-19. It admits that two FBI agents and one FBI employee were made aware of this information shortly after the search of the residence and presumably before the detention hearing, and that a "knowledgeable case agent" learned as much within one month of the hearing. Opp. at 2:11-12.

However, despite these concessions, the government accuses Mr. Li of not providing the Court with "straight" information and even goes so far as to state, "That defendant would direct the Court to a source like Mr. Walker as exonerating him should be of substantial concern to the Court. That defendant will say or do anything to try to get out of jail should give the Court great pause about releasing him." Opp. at 3:24-26. The defense fails to see how any of the information provided about the shotgun is not "straight," given that the government readily admits that the shotgun found at Mr. Li's residence belongs to Mr. Walker. *See, e.g.*, Opp. at 1:16-19; 2:9; 2:16-17. This was the primary contention related to Mr. Walker that Mr. Li made in his Motion.[2]

---

[2]  Mr. Li made one other contention related to Mr. Walker in his Motion that the government did not address or negate in its Opposition: when the defense asked Mr. Walker to submit an affidavit attesting to the true ownership of the shotgun, Mr. Walker refused because the FBI had instructed him not to sign anything related to the shotgun. Pastora Decl. ¶ 7.

In its Opposition, the government claims that the core trial team was not aware that Mr. Walker owned the shotgun found at Mr. Li's residence until he filed his Motion on August 6, 2014. In other words, in the one hundred and thirty three (133) days between the government's search of Mr. Li's residence and the filing of his Motion, the government was unable to "filter" highly pertinent information regarding the shotgun's true owner. Opp. at 2:12-18.  Nevertheless, the government concedes that a "knowledgeable case agent" interviewed Mr. Walker four months ago, on April 25, 2014, and created an FBI 302 record of interview—which itself has yet to be produced in discovery as *Brady* material. Opp. at 2:11-16.

In its Opposition, the government argues that regardless of who owned the shotgun, Mr. Li was still "in possession" of the shotgun because it was found at his residence. Opp. at 2:21-26. However, the Ninth's Circuit has defined "possession" of a firearm, in the context of 18 U.S.C. § 922(g) and 924(c), as requiring the defendant to "*knowingly* ha[ve] the power and intention at a given time to exercise dominion and control over [a] shotgun, [and a] sufficient connection between [defendant] and the shotgun to support an inference that [defendant] exercised dominion and control over it." *United States v. Tucker*, 641 F.3d 1110, 1123 (9th Cir. 2011) (emphasis added).

Any factual contention that Mr. Li knew about the shotgun found in his residence is notably absent from the Opposition. The government does not attempt to prove that Mr. Li was aware of the shotgun's presence in his residence for the simple reason that Mr. Li was not, in fact, so aware. Mr. Li neither knew about nor intended to exercise dominion and control over this shotgun. As the government concedes, the shotgun was recovered from a crawl space underneath the residence that Mr. Li rented from Mr. Walker. Opp. at 3:19-20. Mr. Li and Ms. Li did not themselves use the crawl space underneath the residence. Li Decl. ¶ 3. They never entered that crawl space and did not know what items Mr. Walker stored there. Li Decl. ¶ 4.  Having searched and seized the contents of the crawl space, the government is not able to point to any other piece of property connected to Mr. Li, which might suggest his dominion and control over that storage area.

As other federal district courts have found, if it is "unclear that [the defendant] was aware of [the] presence" of a firearm, that presence does not establish a defendant's danger to the community. *See, e.g., United States v. Adams*, 794 F. Supp. 2d 989, 993 (S.D. Iowa 2011). The burden rests on the

government to prove by clear and convincing evidence that a defendant it seeks to detain is a danger to the community. *United States v. Salerno*, 481 U.S. 739, 739 (1987). Given that Mr. Li did not own or knowingly possess the shotgun found at his residence, the shotgun cannot support a finding of Mr. Li's dangerousness.

Perhaps because the government could not find any evidence that Mr. Li knew about the shotgun, it instead claims that Mr. Walker is of "questionable credibility" based on a discussion between Mr. Li and his wife about Mr. Walker that clearly did not relate in any way to the shotgun. The government asserts that, in a recorded prison call conversation with his wife about the electricity in their home, Mr. Li stated that Mr. Walker "knew what was going on," "approved of it," and that an electrical problem would cost $200 to fix.[3] Opp. at 3:9-13. The government asks the Court to make two blind leaps of logic based on these excerpts. First, the government asks the Court to assume, without access to prison call tapes or any further information regarding the context of Mr. Li's statements, that the conversation about electricity repairs actually related to a marijuana grow, as opposed to an everyday landlord/tenant dispute about a legitimate home repair. Second, the government asks the Court to believe that this unrelated and irrelevant conversation regarding ordinary electrical repairs somehow demonstrates that Mr. Li must have known about Mr. Walker's shotgun. The government's reliance on this complete non sequitur to support its position should demonstrate to the Court the government's desperate search for any basis, no matter how tenuous, to support the allegation that Mr. Li knew about, and therefore possessed, the shotgun.

The government then passes judgment on Mr. Walker's character and calls his actions "highly suspect." Opp. at 3:16. Specifically, the government takes issue with Mr. Walker's having left the shotgun in the Li's home without warning them to be cautious. Opp. at 3:20-21. However, even if Mr. Walker's character were at issue here, which it is not, it is perfectly understandable—given the fact that the Li's never entered Mr. Walker's crawl space—that Mr. Walker would have found it unnecessary to warn the Li's about its contents. The fact remains that the Court ordered Mr. Li

---

[3] To date, the government has not produced any discovery of whatever inmate call recordings it possesses involving Mr. Li, despite its Rule 16 obligations to do so, and despite relying on the recordings in its Opposition.

1  detained because it did not have access to information about the shotgun's true ownership. Now that
2  Mr. Li has provided the Court with this new, material information, the Court should reopen Mr. Li's
3  hearing and reconsider the order of detention. Given that Mr. Li did not own or know about the
4  shotgun prior to his detention hearing, the existence of the shotgun cannot support a finding that the
5  government presented clear and convincing evidence demonstrating that Mr. Li is a danger to the
6  community.

**B.    The Ballistic Vest Belonging to Sgt. Kim**

The government does not deny that the ballistic vest recovered from Ms. Li's vehicle belongs to Sgt. Kim. Indeed, the government acknowledges that the vest recovered from Ms. Li's vehicle "belong[ed] to the Sheriff's Office." Opp. at 4:13.  Instead, the government casts aspersions on the chain of events that caused the vest to be placed in Ms. Li's vehicle. It claims that this chain of events is unbelievable and that Mr. Li's jail telephone conversation with his wife indicates that he knew about the seized vest before his detention hearing. It further claims that Sgt. Kim and Ms. Li submitted false declarations. None of these claims have merit.

The government expresses disbelief at the facts explained in Sgt. Kim and Ms. Li's declarations, claiming that the chain of events that caused Sgt. Kim's ballistic vest to end up in Ms. Li's vehicle is "unbelievable." Opp. at 4:6. The government argues that "this story, on its face, strains credulity[.]" Opp. at 4:17. However, the government misstates that "story" in its Opposition, contorting the facts presented in the declarations. The truth, as stated in the collective declarations submitted in support of Mr. Li's Motion, is that Sgt. Kim left the vest with his wife, who was at Ms. Li's salon, and asked her to take it home for him. Kim Decl. ¶¶ 4-5. When Sgt. Kim's wife inadvertently forgot the ballistic vest at Ms. Li's salon, Ms. Li took the vest with her, intending to return it to Sgt. Kim. Kim Decl. ¶¶ 17-18; Li Decl. ¶ 18.  Sgt. Kim did not decide at that point that "he did not need" the vest at all, as the government alludes; rather, because he had another vest that he could use in connection with his job, he did not require the immediate return of this vest. Kim Decl. ¶ 10. Both the Li's and the Kim's have young children and busy schedules, which prevented the prompt return of the vest. However, as Sgt. Kim and Ms. Li explain, Sgt. Kim intended to retrieve the vest from Ms. Li and Ms. Li intended to return it. Kim Decl. ¶ 8; Li Decl. ¶ 19.

      Although according to the government, it "defies all logic" that a law enforcement officer might leave his government-issued property in Ms. Li's possession and then neglect to promptly retrieve this property (Opp. at 4:11), the FBI agents involved in this investigation did just that when conducting the search of the Li's residence and property on March 26, 2014. The FBI agents that searched Ms. Li's vehicle left government-issued gun ammunition clip in her car. Li Decl. ¶ 21. They took no initiative and made no affirmative efforts to retrieve this gun clip from Ms. Li's vehicle. Indeed, the defense has seen no evidence that the FBI agents even reported the gun clip missing internally, or that they sought to warn Ms. Li of the lost gun clip despite their knowledge of a child residing at the location. In fact, the FBI only retrieved the gun clip from Ms. Li's vehicle after Ms. Li notified defense counsel, who immediately informed the FBI that they had left the gun clip behind after conducting the search. Li Decl. ¶ 23. Given that the FBI agents assigned to this investigation left government-issued, firearms-related property in Ms. Li's vehicle for a number of days—and possibly would have left it there indefinitely had Ms. Li not brought it to their attention—the chain of events that led to the presence of Sgt. Kim's ballistic vest in Ms. Li's vehicle is not as implausible or "unbelievable" as the government suggests.

      The government attempts to cast doubt on the veracity of Sgt. Kim's declaration by again introducing irrelevant and unrelated incidents and referencing Sgt. Kim's youthful history. According to the government, this irrelevant and dated information demonstrates that Sgt. Kim is "highly compromised," and thus, his declaration must be false. Opposition at 6:20-21. In support of these assertions, the government makes the following factual contentions:[4] Mr. Li and Sgt. Kim are old friends who both had prior involvement with Raymond Chow (Opp. at 6:8-10), Mr. Li told an undercover agent that Sgt. Kim was "trustworthy" (Opp. at 5:4), and Mr. Li and Sgt. Kim were in a

---

[4] The government makes numerous factual contentions throughout the Opposition, but it has not submitted a single affidavit or declaration in support of these contentions, as required by Local Criminal Rule 47-2(b). N.D. Cal. Local Crim. R. 47-2(b); N.D. Cal. Local Civ. R. 7-5(a) ("Factual contentions made . . . in opposition to any motion must be supported by an affidavit or declaration[.]"). Accordingly, the Court should give no weight to the government's factual contentions without hearing testimony from the FBI agents and employees involved in Mr. Walker's attempts to report his ownership of the seized shotgun, and from the FBI agents involved in the interviews concerning the ballistic vest recovered from Ms. Li's car.

Gibson, Dunn & Crutcher LLP

traffic collision together. Opp. at 5:7-12. The government apparently believes that these contentions are sufficient to justify a full-fledged and desperate attack on the reputation of a fellow law enforcement officer.

To the contrary, none of these contentions support the inference that Sgt. Kim is "highly compromised." The defense never attempted to conceal the friendship between Mr. Li and Sgt. Kim. Mr. Li's Motion explicitly stated, "The ballistic vest did not belong to Ms. Li, but rather to Michael Kim, *a friend of the Li's*[.]" Motion at 7:6 (emphasis added). Mr. Li and Sgt. Kim's friendship is entirely consistent with the chain of events described in Ms. Li's and Sgt. Kim's declarations regarding Sgt. Kim's ballistic vest. Further, the government's description of Sgt. Kim's youthful involvement with Chow is of no consequence—particularly when the government has not charged Sgt. Kim following its lengthy investigation in this matter. And the fact that Mr. Li allegedly referred to Sgt. Kim as "trustworthy" means simply that—Mr. Li believes that Sgt. Kim is honest and truthful.

The government next introduces another non sequitur—that Mr. Li and Sgt. Kim were involved in a traffic collision together—to detract from the issue of the ownership of the ballistic vest. The government alleges that, despite the traffic collision report's statements to the contrary, Sgt. Kim was intoxicated at the time of the accident and Mr. Li and Sgt. Kim "covered up" Sgt. Kim's intoxication. Opp. at 5:11. However, the traffic collision report prepared by Officer Farley, attached as an exhibit to the government's Opposition states, "I determined that [Sgt. Kim] was not under the influence of an alcoholic beverage." Opp. Ex. 1 at 9. Unfortunately for the government, the official police report of this incident does not support the government's contention that Sgt. Kim is a "highly compromised" declarant because of this accident. That the government only seeks to discredit Sgt. Kim by pointing to a traffic accident rather than any police disciplinary history, to which the government has ready access, clearly indicates that no such disciplinary record exists.

The government then cites slight discrepancies between Sgt. Kim's and Ms. Li's accounts that apparently emerged in FBI interviews (although the government did not submit declarations from these FBI agents or any other information about these interviews) in an attempt to paint Sgt. Kim and Ms. Li as "incredible." Apparently, when questioned by the FBI, Sgt. Kim, his wife, and Ms. Li did not recall the exact same day of the week and time of day of an ordinary trip to the hair salon that

took place more than six months prior to the FBI's interviews. However, such lapses in memory do nothing to discredit Sgt. Kim and Ms. Li. It is perfectly understandable that they would remember the general sequence of events that led Sgt. Kim's ballistic vest to end up in Ms. Li's vehicle without remembering minute details such as precise days of the week and times of day of an event that held no significance when it took place. Indeed, one would expect their stories to be perfectly aligned if they were in collusion, as the government alleges. As with Mr. Walker, the government erects a smokescreen regarding Sgt. Kim's and Ms. Li's characters without denying the fundamental claim for which the defense introduced their declarations—that the ballistic vest it recovered in Ms. Li's vehicle "belong[ed] to the Sheriff's Office." Opp. at 4:13.

According to the government, a recorded telephone conversation between Mr. Li and his wife that took place after his detention hearing on April 8, 2014 demonstrates that he knew about the seized vest before his original detention hearing. The government claims that Mr. Li told his wife, "And then the bullet proof vest, I told [my attorney] I use that to bounce. Like, I don't know why she didn't say nothing." Opp. at 5:18-19. The government concludes that this conversation leaves no doubt that Mr. Li "was well aware of the ballistic vest at the time of his hearing[.]" Opp. at 5:20-6:1.

However, the government's argument overlooks the fairly obvious point that Mr. Li's original detention hearing included discussions of multiple ballistic vests. Early in the hearing, the government alleged that "Mr. Li provid[ed] a ballistic vest to [an] undercover[.]" Reporter's Transcript of April 8, 2014 detention hearing at 4:1 ("Tr."). Indeed, the government and the Court engaged in a lengthy exchange regarding the government's inability to locate the page or section in its Complaint or Indictment that pertained to Mr. Li's alleged provision of a ballistic vest to an undercover agent. Tr. at 4:15-5:18. Several minutes later, the government claimed, "A ballistic vest was found in a vehicle which I understand to be his wife's vehicle." Tr. at 9:5-6. At the end of the hearing, the Court referenced both ballistic vests. It first stated, "[W]hen arrested, the defendant had in his possession . . . a ballistic vest." Tr. at 18:12-13. It continued, "Mr. Li provided . . . a ballistic vest to the undercover agent[.]" Tr. at 18:16-20.

The government now attempts to conflate the two vests and alleges that the taped prison conversation indicates "without a doubt" that Mr. Li was aware of the ballistic vest found in Ms. Li's

8

REPLY TO GOVERNMENT OPPOSITION TO MOTION TO REOPEN DETENTION HEARING AND RECONSIDER DETENTION –
CASE NO. CR 14-196

1  car. To the contrary, Mr. Li's recorded statement to his wife regarding "the bullet proof vest" did not

2  refer to the ballistic vest seized by the government during its search of Mr. Li's residence.  It referred

3  to the second of the two vests at issue during the detention hearing.  Thus, the tape recorded

4  conversation does not make it "clear" that Ms. Li and Sgt. Kim submitted false declarations to the

5  Court, as the government would like the Court to believe.  Because Mr. Li did not own or know about

6  the ballistic vest discovered in his wife's vehicle, the existence of this vest cannot support a finding

7  that Mr. Li is a danger to the community.

**C.    Mr. Li's Statements At The March 29, 2013 Dinner Do Not Indicate A Propensity To Commit Violent Acts**

10   The defense supports the government's recommendation that the Court listen to the audio

11  recordings of Mr. Li's allegedly violent statements, particularly the recordings of the dinner party that

12  Mr. Li attended on March 29, 2013. These recordings demonstrate that Mr. Li's statements are either

13  completely hypothetical[5] or are hyperbolized attempts to impress the undercover agents. Indeed, the

14  conversation participants frequently erupt in laughter during this festive dinner, and they comment on

15  multiple occasions that they are merely "trading stories." 1D233.20130329.1810 (1 of 2) at 03:03:00

16  to 03:07:00.

17   The government mischaracterizes the defense's argument regarding the undercover agents'

18  role in the dinner conversation. It erroneously claims that Mr. Li argued that the agents' lack of

19  "horror at the descriptions of violence by defendant is . . . mitigation for defendant." Opp. at 8:9-11.

20  Mr. Li argued no such thing. In his description of the March 29th dinner, Mr. Li noted that the

21  participants "regaled each other with stories of past ordeals and triumphs, attempting to 'one-up' each

22  other with descriptions of their outlandish (and exaggerated) feats." Mot. at 8:17-18. Mr. Li, the

23  undercover agents and others, were engaged in a bragging contest, each contributing their own stories

24  in an effort to come out on top. By participating in this contest, the undercover agents and others

---

[5] Such hypothetical statements are not probative of a defendant's dangerousness for the purposes of pretrial release. In assessing the potential danger to others or the community posed by release, courts consider whether a defendant *actually*, *as opposed to theoretically*, poses a danger, as evidenced by a defendant's *demonstrated proclivity to commit violent acts*. *See, e.g., United States v. Patriarca*, 948 F.2d 789, 792 (1st Cir. 1991) (emphasis added).

1  involved continuously upped the ante. Thus, the undercover agents shared responsibility for the
2  nature of the conversation.

3      The government only alleges that Mr. Li described one past act of violence at the March 29th
4  dinner, and it provides no evidence whatsoever that this act occurred. According to the government,
5  at this dinner, Mr. Li told a story about running over a pedestrian. Opp. at 7:10-14. However, the
6  government does not present any evidence to allow the Court to conclude that this was anything more
7  than talk. Since the government clearly has no difficulty accessing old traffic reports, the government
8  surely would have attached the record of this incident to its Opposition if such a record existed.

9      The fact that many of Mr. Li's statements at the March 29th dinner were made in jest does—
10 contrary to the government's assertions—indicate Mr. Li's lack of seriousness. That Mr. Li described
11 violent acts in jest does not "makes his situation worse." Opp. at 7:27. Rather, Mr. Li made these
12 statements in jest because he did not intend others to take them seriously. For example, at one point
13 during the dinner, Mr. Li asked those around him, "Why is Halloween the best time to kill someone?"
14 He then delivers the punch line—"Because you can wear a mask!"—and the crowd erupts in
15 laughter. 1D233.20130329.1810 (2 of 2) at 00:25:40. Although possibly offensive to some, this joke
16 does not demonstrate that Mr. Li has a violent character or that he was "laugh[ing] about the violence
17 that he . . . want[ed] to commit." Opp. at 7:26-27.

18     Of course, the most telling evidence that Mr. Li's statements do not demonstrate a propensity
19 for violence is that they remained merely statements. Mr. Li never followed up these statements with
20 any violent action, and the government has not charged him with any crimes related to his colorful
21 comments. As the defense argued in its Motion, the government conceded "that these comments did
22 not warrant detention and that they did not believe Mr. Li intended to act on these statements by
23 allowing Mr. Li to roam free for . . . years after uttering these statements." Mot. at 9:16-18.

24     The government claims that the undercover agents were, in fact, concerned that Mr. Li "might
25 actually commit some act of violence before he could be arrested," and, in order to dissuade him,
26 they emphasized "how important it was to them that he **not** become engaged in any violence." Opp.
27 at 7:17-22. However, apparently the undercover agents believed that a simple instruction to "not

become engaged in any violence" was sufficient to mitigate any risk that Mr. Li would commit a violent act.

### D. Other Audio Recordings Similarly Do Not Support The Government's Claims Regarding Mr. Li's Dangerousness

Mr. Li's Motion describes two other recordings that contradict the government's claims of dangerousness. Although the Motion notes that these recordings are often inaudible, Mr. Li never claimed, as the government suggests, that this implies mischaracterization. Instead, Mr. Li makes two points about these recordings that the government does not attempt to refute in its Opposition. First, Mr. Li's description of his "collection" activities do not indicate a propensity for violence. When Mr. Li offers to help the undercover agent retrieve money owed to him, he advises the undercover agent, "You've just gotta be nice." 1D207.20130123.1335 at 01:13:43. The undercover agent asks, "I assume you're the good guy?" and Mr. Li replies, "Yeah. I'm good at negotiating." *Id.* Second, when the undercover agent met with James Pau ("Mr. Pau") , the undercover agent, not Mr. Pau, supplied all of the operative words regarding Mr. Li. Pau says, "Andy is old school," to which the undercover agent replies, "He's old school Hop Sing Tong." 1D726.20130718.1300 at 00:20:02. Pau says, "No matter how good Andy dresses, he still looks like a—" The undercover agent interjects, "A thug." *Id.* Pau says, "I'm the one that make phone call, he's the one that go—" The undercover agent interjects, "Right, do it," and laughs. *Id.* Pau only describes Andy as a lieutenant after the undercover states, "You need to bring Andy out when you really need some work done, because he's a good soldier, man." *Id.* Thus these two exchanges belie the government's argument that either Mr. Li's collection activities or statements by Mr. Pau indicate dangerousness.

That Mr. Li's Motion does not contest the government's allegation that he "bragged that he was the head of enforcement for the CKT" does not, in fact, "speak volumes." Opp. at 9:2. As the defense explained in its Motion, due to the extensive volume of discovery in this case, it has not reviewed all of the recordings produced by the government. In the discovery reviewed thus far, however, Mr. Li never claims to be the group's head of enforcement. The government does not provide any citation or other support for its factual contention regarding Mr. Li's alleged boasts, nor

has it charged him with any violence committed in this supposed role. Accordingly, this allegation is not clear and convincing evidence that Mr. Li is a danger to the community.

Mr. Li's alleged statement regarding "getting rid of the bugs" should be given little weight. The government claims that "the individual that defendant discussed when he stated he needed to 'get rid of the bugs' was subsequently murdered in a still unsolved homicide," insinuating that Mr. Li was involved. Opp. at 9:5-7. Once again, the government introduces a red herring in an attempt to distract the Court from the facts relevant to Mr. Li's detention or release. The government has not charged Mr. Li with this alleged murder, nor has it presented any evidence suggesting that he was in any way connected. It, quite simply, has nothing to do with the validity of Mr. Li's Motion.

### E. Neither Mr. Li's Charges Nor His Criminal History Support A Finding Of Dangerousness

The government's Opposition cites Mr. Li's charges and his dated criminal history as final reasons for the Court to detain defendant. As Mr. Li's Motion explains, the nature and circumstances of Mr. Li's alleged offenses do not suggest that he is a danger to the community. Mot. at 12:17-14:3. And it remains true that Mr. Li has not been convicted of a crime in over thirteen years. Accordingly, neither the nature and circumstances of Mr. Li's alleged offenses, nor his criminal history, supports a finding of dangerousness.

### III. CONCLUSION

Because information discovered after Mr. Li's original detention hearing demonstrates that he does not pose a risk of danger to other persons and the community, defendant asks the Court to deny the government's request to rule without further hearing. Instead, defendant respectfully requests that the Court reopen his detention hearing and release him pending trial, either with or without a hearing.

Dated: August 26, 2014

                                         WINSTON Y. CHAN
                                         VANESSA A. PASTORA
                                         JOANNA L. POWELL
                                         GIBSON, DUNN & CRUTCHER LLP

                                         By:  */s/ Vanessa A. Pastora*

                                         Attorneys for Andy Li