1 | J. TONY SERRA #32639
CURTIS L. BRIGGS #284190
2 | GREG M. BENTLEY #275923
506 Broadway
3 | San Francisco CA 94133
Telephone: 415/986-5591
4 |
Attorneys for Defendant
5 | KWOK CHEUNG CHOW

6 | UNITED STATES DISTRICT COURT

7 | NORTHERN DISTRICT OF CALIFORNIA

8 |

9 | UNITED STATES OF AMERICA,        CR 14-196 CRB

10 | Plaintiff,        DEFENDANTS CHOW, NIEH, CHIU,
SIU, PAU, AND YUN'S, REQUEST
11 | v.        TO RESET *FRANKS* MOTION
SUBMISSION AND HEARING DATES;
12 | KWOK CHEUNG CHOW, aka        MEMORANDUM IN SUPPORT
RAYMOND CHOW,
13 |
Defendant
14 |        Date: TBD
Time: TBD
15 | _____/        Place:TBD

16 | **NOTICE AND MOTION**

17 | TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS:

18 |

19 | Defendants KWOK CHEUNG CHOW, GEORGE NIEH, ALAN CHIU, KEVIN

20 | SIU, JAMES PAU, AND LESLIE YUN, hereby request that the

21 | currently scheduled Franks motion submission date of May 28,

22 | 2015, and hearing date of July 7, 2015, be vacated and that the

23 | hearing date be converted to a status conference to consider the

24 | matters presented herein. A continuance of the contemplated

25 | Franks motion is required so that defense counsel can conduct

26 | further investigation under its obligations set forth in

27 | Strickland v. Washington due to the following conditions:

LAW OFFICES
506 BROADWAY
SAN FRANCISCO

28 |

(1) While review of discovery is still in the initial stages, defendants' partial review has revealed significant discrepancies between FBI wiretap applications and the discovery produced to date;

2) The government has recently identified that audio evidence will not be made available to the defense due to a technical error by a government contractor requiring the defendants to request the original source material and/or inspection of the equipment used and methodologies employed in order to extract this discoverable evidence or conduct a forensic analysis to determine the contours of what may turn out to be the destruction of evidence;

3) Discovery indices were only recently provided to the defense which will likely prove invaluable in allowing the defense to thoroughly review the thousands of hours of audio and video which, to date, has been very difficult to discern and organize.

Defendants request that the currently scheduled hearing date of July 7, 2015, be converted to a status conference to determine the status of discovery requests and whether discovery motions are required before re-setting a Franks motion briefing schedule and hearing date.

**LAW OFFICES**
506 BROADWAY
SAN FRANCISCO

2

1

2

3

DATED: May 28, 2015          /s/ J. CURTIS BRIGGS
4                                J. TONY SERRA
                                 CURTIS BRIGGS
5                                GREG BENTLEY
                                 Attorneys for Defendant
6                                KWOK CHEUNG CHOW

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**LAW OFFICES**
506 BROADWAY      28
SAN FRANCISCO
                                 3

1      **MEMORANDUM OF POINTS AND AUTHORITIES**

2  **A.    Procedural History**

3          The previously scheduled <u>Franks</u> motion submission date was

4  March 26, 2015.  This Court granted a previously requested 60-

5  day extension to the defense on April 3, 2015. (Docket #745.)

6  The materials are voluminous: there is much to examine, with the

7  information situated within over 9 million[1] files in discovery

8  and, until recently, without indices to make it feasible to

9  organize a cogent review. Through no fault of their own,

10  defendants' attorneys have only reviewed a portion of the

11  applicable discovery made available to them by the government,

12  making the necessary investigation in preparation for <u>Franks</u>

13  submissions far from complete.

14          Defendants sought a stipulation for a continuance from the

15  United States.  A productive informal-non-supervised discovery

16  conference was held on May 19, 2015, where issues concerning the

17  late produced, still missing, and disorganized discovery were

18  addressed. The United States was agreeable to a continuance with

19  all defendants but premised the stipulation on the condition

20  that Raymond Chow would not bring about a challenge related to

21  any issues already raised in <u>Franks</u> pleadings for Keith Jackson

22  and Leland Yee previously filed with this Court.[2]   The

23  _____

24          [1]   This does not include the two most recent productions
    by the government. Total number of files

25          [2]   Even though Chow remains joined in Yee and Jackson's
26  motions, it was more practical for Chow to collaborate with
    defendants not in Trial Group One in identifying and briefing
27  potential <u>Franks</u> issues.  Chow's opportunity to be heard would
    be foreclosed if he relied solely on his joinder with Yee and

28

**LAW OFFICES**
506 BROADWAY
SAN FRANCISCO

1  government's condition was unacceptable to defendant Chow

2  because he is presently engaged with all other defendants in

3  evaluating <u>Franks</u> issues for consideration of an omnibus <u>Franks</u>

4  motion to be presented jointly.  This Court granted a CJA

5  request to appoint counsel to draft a joint motion based on the

6  collective review of those defendants who have standing to

7  pursue a <u>Franks</u> motion.

8       Defendant Chow should not be required to bargain away his

9  right to raise <u>Franks</u> issues independent of those raised by

10 defendants Yee and Jackson in exchange for a stipulation to

11 extend the <u>Franks</u> deadline; especially prior to conducting an

12 adequate investigation of all wiretaps which list Chow as a

13 target.

14      It was not Chow or his counsel who created the need for

15 this renewed continuance. Rather, the inability to provide a

16 cogent and useful guide to the voluminous discovery and to

17 account for missing and/or destroyed discovery falls squarely on

18 the government despite multiple instances of prior requests to

19 release a table of contents for discovery.  The government

20 opposes this continuance.

21 **B.    While Review of Discovery Is Still in the Initial Stages,**
   **Defendants' Partial Review Has Revealed Significant**
22 **Discrepancies Between FBI Wiretap Applications and the**
   **Discovery Produced to Date**

23
        The Supreme Court has stated that "counsel has a duty to
24
   make reasonable investigations or to make a reasonable decision
25
   that makes particular investigations unnecessary." <u>Strickland v.</u>
26

27 ────────────────

   Jackson's motions under the proposed stipulation.

1  <u>Washington</u>, 104 S.Ct. 2052, 2066 (1984), "When evidence is

2  equally available to both the defense and the prosecution, the

3  defendant must bear the responsibility of failing to conduct a

4  diligent investigation." <u>United States v. Brown</u>, 628 F.2d 471,

5  473 (5th Cir. 1980). Moreover, "a particular decision not to

6  investigate must be directly assessed for reasonableness in all

7  the circumstances, applying a heavy measure of deference to

8  counsel's judgments." <u>Ibid</u>.

9      Here, defendants counsel have deemed it critical to

10  thoroughly investigate eight wiretap applications and one GPS

11  application along with corresponding audio and video going back

12  to 2008. The challenge for defendants is that the materials are

13  voluminous: there is much to examine, with the information

14  situated in over 9 million files in discovery and, until

15  recently, without indices to make it feasible to organize a

16  cogent review.

17      Defendants need a continuance to focus on body-wires. Many

18  of the body-wires involve UCE 4599 who seemed to record most if

19  not all his interactions with all subjects of this

20  investigation.  UCE 4599 would record from the time he left his

21  FBI funded hotel or apartment to the time he returned, often

22  eight or ten hours later.  Those recordings involve hundreds, if

23  not thousands, of interactions with hundreds of people about a

24  variety of topics, a fraction of which were used to apply for

25  wiretaps used to ultimately indict the defendants.

26      The defense counsel who have engaged in review of these

27  body-wire recordings have reported that FBI wiretap applications

28

**LAW OFFICES**
506 BROADWAY
SAN FRANCISCO

1 involve, at minimum, significant misrepresentations.  No

2 attorney in the unassigned trial group has had sufficient time

3 to reasonably investigate the recordings in their entirety and

4 determine their relevance to <u>Franks</u> issues in order to present

5 them to counsel assigned to draft the <u>Franks</u> motion.

6     During this cursory review of these audio recordings some

7 alarming disparities have come to light which will require all

8 defense counsel to examine audio and video more thoroughly than

9 originally thought.  Otherwise, presentation of an omnibus

10 <u>Franks</u> motion will be ineffective.

11     One example of the types of misrepresentations made by UCE

12 4599 is instructive: when UCE 4599 recorded himself on his own

13 body-wire in the restroom of a nightclub while on the phone, he

14 misled another agent about a conversation UCE 4599 had just

15 recorded previously that evening between himself and Raymond

16 Chow. During the restroom conversation, UCE 4599 falsely

17 explains to the caller on the phone that Chow has a source of

18 supply of contraband in Mexico, that Chow is going to introduce

19 UCE 4599 to that source of supply, and that the introduction is

20 going to take place the next month. The conversation was as

21 follows:

22      "Buddy what's up. Hey dude, it's gonna be an all-star

23      cast here. Yeah, andy [inaudible], let's see,

24      [omitted], everybody's coming, so .... Yeah. Uh, just

25      come now. Really quick, next month, introduction to a

26

27

**LAW OFFICES**
506 BROADWAY
SAN FRANCISCO

28

1    Mexican source. Mexican, [source of supply][3]. Yeah,

2    huge. Huge. Yeah. Yep. Yep. Oh, dude. Well it came up

3    because it's like, you know, it came up because

4    it's... he saw the envelope, you know what I'm saying?

5    Yeah. Yep. Bro, you know what I'm saying? Yep. Ain't

6    no lie dude, it's like, I didn't bring it up, you know

7    he brought it up, you know. So. SB [Shrimpboy]. Yeah,

8    yeah, yep, yep. I wanna introduce you to this guy. He

9    said he runs the ports down in Mexico. Yep, mhm, yep,

10   yep. Hey. Alright! Okay! That'll keep us going,

11   yeah?"[4]

12

13   A review of the recorded conversation UCE 4599 was

14   referring to reveals that Chow explicitly said he had never met

15   anyone at the Port of Mexico and he was never involved in any of

16   their activities. Furthermore, there is no suggestion that they

17   are discussing illegal activities.  In fact, Chow made it clear

18   that the person who Chow offered to introduce to UCE 4599 (that

19   had contacts at the Port of Mexico) was not a member of the Port

20   itself and was characterized by Chow as a person who makes

21   "honest mistakes."  There was never a mention of Chow

22   introducing UCE 4599 to anyone at the Port of Mexico or anyone

23   anywhere in Mexico whatsoever.  Not once was it arranged that

24   _____

25      [3]   UCE 4599 used the term "S.O.S." which is commonly
     known in narcotics enforcement as an abbreviation for Source of
26   Supply.

27      [4]   Informal transcript and in no way adopted by the
     government, nor have they been given the opportunity to do so.

28

LAW OFFICES
506 BROADWAY
SAN FRANCISCO

1  any introduction would take place the following month.[5]

2      In no way did Chow say he could or would introduce UCE 4599

3  to a guy who runs the Port of Mexico. If the affiants presenting

4  wire tap applications relied on UCE 4599's accounts and reports,

5  which they indicated that they did, and UCE 4599 is demonstrated

6  as willing to mislead another agent, then all of UCE 4599's

7  recorded interactions need to be analyzed closely so that this

8  Court may be provided accurate information in which to determine

9  an omnibus <u>Franks</u> motion.

10     Other conversations and interactions involving cash

11  payments to Chow by UCE 4599 were seriously misrepresented in

12  wiretap applications. These will be addressed in the <u>Franks</u>

13  motion, but in general it can be said that both Agents Pascua

14  and Vanderporten painted a dramatically different picture of

15  Chow's attitude toward taking any money and Chow's knowledge of

16  criminal activity than what is borne out in some of the

17  discovery reviewed to date.

18     On average Chow protested the cash gifts much more

19  rigorously than reported, attempted to give the cash back

20  multiple times, sounded dejected at being placed in the position

21  to accept the gifts, and failed to exhibit any outward sign of

22  knowledge of UCE 4599's supposed criminal behavior. Furthermore,

23  the FBI boldly asserted in applications that all defendants were

24  engaging "La Cosa Nostra." UCE 4599's cover name was David

25  Jordan who posed as an American investment consultant with a

26  _____

27      [5]   Based on the portion of Bates around 1D151 at
    01:56:30.

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
28

1   business partner who was African-American, and another who was

2   Asian-American. If UCE 4599 was supposed to be La Cosa Nostra no

3   one informed the defendants of that contrary to what the wiretap

4   applications suggest.

5       UCE 4599 recorded himself on numerous occasions planning to

6   deceive Chow about the purported illegality of the cash payments

7   in an effort to get him to acquiesce in accepting money by

8   making Chow believe the payments were a lawful gratuity.  This

9   is never mentioned in the applications. Agent Vanderporten

10  attests under penalty of perjury that Chow made "several

11  exculpatory statements" throughout this investigation.  The

12  truth is that there are hundreds of exculpatory statements and

13  acts reflected on the body-wires prior to government agents

14  submitting the wiretap applications.

15      Given that a majority of defendants[6] interacted with UCE

16  4599 and it is those body-wire conversations with UCE 4599 that

17  were used to support probable cause in at least the first two

18  wiretap applications, all portions of body-wires must now be

19  reviewed for information relevant to omissions and

20  misrepresentations in the wiretap applications.  Seemingly

21  irrelevant time periods may have been reviewed much more quickly

22  and with less attention than before this was discovered.  The

23  extent to which other conversations were misrepresented is a

24  recent discovery and has caught nearly all defendants' attorneys

25  _____

26      [6]   All defendants are joined in this motion, however,
    Leland Yee and Keith Jackson have been assigned as the first
27  trial group and although joined, their interactions were less
    with UCE 4599 than other UCE's.

LAW OFFICES
506 BROADWAY
SAN FRANCISCO

28

1   by surprise.

2   **C.   Defendants Require Access to Original Source Material
        and/or Equipment to Determine Whether Evidence is No Longer
3       Available as the Government Represents and/or Why Evidence
        Was Not Preserved**

4
        The equipment installed in Nieh's car (Target Vehicle

5   wiretaps one and two)consisted of two devices that were

6   intercepting audio. One was an Audio Visual Line which could

7   intercept both audio and visual material(Line AV). The other was

8   capable of intercepting only audio (Line A). Therefor, the line

9   sheets, were labeled "A" for the audio only line and "AV" for

10  the audio visual line. The line sheets were prepared by agents

11  who were listening (and viewing)to the interceptions and noted

12  on the line sheets the identities of the participants and

13  summarized the intercepted conversations. On October 30, 2014

14  the government informed defense counsel that the "listener

15  prepared line-sheets for the line that had the best audibility

16  of the two." The government has provided line-sheets for the two

17  lines.

18      The defense review of the line-sheets of which there are

19  hundreds, and which is only partially done, reveals that many of

20  them are designated "AV" leading the defense to believe that the

21  "AV" line is the one that is most audible.

22      The government notified the defense on or about May 18,

23  2015, that the recordings from the interior of defendant Nieh's

24  vehicle cannot be accessed due to a technological error.  The

25  United States relied on and quoted heavily from these recorded

26  conversations in their Affidavit in Support of Complaint in this

27

**LAW OFFICES**
506 BROADWAY
SAN FRANCISCO

28

1   matter.  These in-car recordings were relied on in multiple

2   wiretap applications to varying degrees as well. Additionally,

3   many defendants report a pattern of body-wire recordings which,

4   according to UCE 4599, "malfunctioned" resulting in significant

5   recording gaps in conversations which were critical in support

6   of probable cause for all wiretaps in this investigation.[7]

7        Under Strickland, the defense has a duty to gain possession

8   of recording equipment and original data files in an effort to

9   extract Brady material from them. This is especially so given

10  the nature of misrepresentations discovered so far.  The defense

11  has requested access to the recording equipment and original

12  data files in order to attempt to extract this information

13  currently unavailable to them.  Depending on the outcome of that

14  effort, the defense will potentially seek testing of the devices

15  themselves in order to ascertain when and how the devices

16  malfunctioned, when the malfunctioning should have been known to

17  have occurred by government agents and whether there was

18  indifference by the government to maintain the discovery.

19       These developments will take time for the defense to obtain

20  appropriate court orders to facilitate extraction and testing.

21  Now is the time to pursue this avenue of investigation for the

22

23  _____

24       [7]    The first sign of any criminality in Operation
    Whitesuit was years in when 4599 recruits a co-defendant during
25  a government sponsored meal (with alcohol) believed to total
    more than a thousand dollars, where 4599 introduces the concept
26  of money laundering for the first time in this investigation. He
    then recruits participants and attempts to install within the
27  Chinese Freemasons a previously non-existent criminal
    enterprise. Several hours of this dinner conversation was not
28  captured on the body-wire due to a "malfunction."

LAW OFFICES
506 BROADWAY
SAN FRANCISCO

1   defense because if not permitted to do so before <u>Franks</u>

2   submissions and hearing, then defendants will forfeit a

3   substantial right and will dampen the effectiveness of a <u>Franks</u>

4   challenge but the need to complete the same investigation will

5   still be present for other stages of this litigation.  The

6   information that may be retrieved from forensic recovery and

7   testing could be critical to determine how this potential

8   evidence destruction occurred and what government agents knew or

9   should have known to avoid or correct it.

10      The FBI applied for wiretaps which allowed them to secretly

11  remove defendant Nieh's Mercedes, take it off-site, and install

12  two audio lines, a video camera, and a GPS tracker.  At one

13  point the FBI reentered the car to repair an audio line that

14  they were somehow aware then that it was malfunctioning.  Of the

15  two audio lines in the car, one of them cannot be retrieved by

16  the FBI and defendants have been informed will not be retrieved

17  for trial due to a technical problem; the other line seemed to

18  have recorded nothing intelligible.  The government represents

19  that the malfunctioning of both audio lines had gone unnoticed

20  until recently despite the surveillance teams and technical

21  support unit's ability to determine one of the two lines was not

22  working at one point during the operation. Furthermore, the

23  wiretap applications and especially the initial Affidavit in

24  Support of the Complaint quote these recordings heavily so it is

25  unclear how this was accomplished without more recent access to

26  the audio.  The defense intends on testing the representation

27  the audio is no longer accessible.

LAW OFFICES
506 BROADWAY
SAN FRANCISCO

28

1    There are other circumstances which suggest the audio files
2  may be retrievable and/or they were retrieved already by the
3  FBI. During a gap of more than a month between wiretaps in
4  defendant Nieh's vehicle, government agents left the
5  surveillance equipment in Nieh's car and, according to the
6  follow up report, they evidently failed to notice the equipment
7  was still recording.

8    Questions are raised as to how they would have discovered
9  the unauthorized inadvertent eavesdropping without the ability
10 to review the audio.  It is possible the two wiretaps in
11 question were the only ones intended to advance the goals of
12 Operation Whitesuit which, as the dust settles, might mean they
13 are of incredible significance.[8]

14    Being of considerable importance to defendant Nieh, his
15 counsel is currently attempting to have the in-car audio
16 enhanced Nieh and Chow's benefit. The government's theory of
17 Chow's alleged knowledge and intent to operate a criminal
18 enterprise is based on the conversations which were recorded in
19 Nieh's car – conversations Chow adamantly insists were actually
20 exculpatory.  Chow's counsel has requested the equipment be
21 preserved and turned over to the defense for forensic testing.
22 This request has been denied by the United States. This is
23 expected to be the subject of future litigation and will take

24

25

26 _____

27      [8]    What has been referred to by the government as the CKT
     Enterprise by the USA.

LAW OFFICES
506 BROADWAY
SAN FRANCISCO
28

1  time to sort out.[9]

2      In a similar vein, UCE 4599 reports routine "equipment

3  malfunctions" of two hours or more during time periods when the

4  defense contends exculpatory conversations took place.  Some of

5  these occurred while UCE 4599 was drinking alcohol in large

6  amounts and entertaining co-defendants. More than one co-

7  defendant insists that the conversations which are the subject

8  of these alleged malfunctions contained exculpatory information

9  that would sharply contradict wiretap applications. This

10 necessitates a more thorough investigation.

11     The defense requires more time to adequately investigate

12 the audio and video in depth in order to present a meaningful

13 Franks motion.  Evidence already suggests that UCE 4599 has

14 fabricated evidence that was used in wiretap applications where

15 it is reported Chow whispered into 4599's ear in a loud karaoke

16 bar, where it was too loud for the body-wire to detect it, that

17 Chow knew of and approved all crime in San Francisco.

18 Significantly, this is the only point in this five-plus year

19 investigation where UCE 4599 made such a claim about what was

20 purportedly captured on the body-wire that remains inaudible or

21 that Chow whispered the alleged blatant inculpatory statement in

22 his ear.  Anything recorded or initially reported by UCE 4599

23 must be investigated closely for the purposes of the Franks

24 motion as there is no reasonable justification for defense

25

26

_____

27     [9]    In United States v. Halgat, 2014 U.S. Dist. LEXIS
81612, the DEA was forced to turn over agent's cell phones for
forensic evaluation in support of the defense of entrapment.

LAW OFFICES
506 BROADWAY
SAN FRANCISCO

28

1    counsel to fail to do so as commanded by <u>Strickland</u>.

2        As <u>Strickland</u> instructs, an attorney may conduct a

3    preliminary investigation and determine that resources are

4    better served on another line of defense. Conversely, an

5    attorney may also decide that a particular line of defense

6    warrants a greater amount of attention.  Due to the significant

7    findings already present, defendants deem investigation and

8    review of wiretaps an area that warrants thorough attention as

9    issues have surfaced (as documented herein) that must be

10   addressed properly and as comprehensively as the <u>Franks</u> hearing

11   will allow. For this reason a continuance is necessary.

12   **D.    The Defense Requires Additional Time to Take Advantage of**
     **Recently Produced Indices by the Government to Conduct a**
13   **Meaningful Analysis of Voluminous Discovery**

14       Defendants were only provided effective discovery indices

15   on April 30, 2015.  Defendants have been hampered in their

16   ability to perform a meaningful discovery review without the

17   knowledge of what makes up the contents of the voluminous

18   discovery without an index categorizing the millions of

19   discovery files contained with over one hundred thousand

20   folders.  The sheer volume of materials collected by the

21   government in this RICO case with twenty-nine (29) named

22   defendants is overwhelming.

23       Courts have recently recognized a need for the prosecution

24   to do more than just turn over a file.  The government should

25   not be allowed to bury <u>Brady</u> material as an exculpatory needle

26   in a haystack of discovery materials forcing defense counsel to

27   divert enormous amounts of time, energy, and CJA funds to find

**LAW OFFICES**
506 BROADWAY
SAN FRANCISCO
28

1   it. See <u>United States v. Skilling</u>, 554 F.3d 529, 577 (5th Cir.

2   2009), aff'd in part and vacated in part on other grounds, 561

3   U.S. 358, 130 S.Ct. 2896 (2010) (suggesting that <u>Brady</u>

4   violations related to voluminous open file discovery depend on

5   "what the government does in addition to allowing access to a

6   voluminous open file").

7       While defendants are appreciative of the government's

8   effort to provide them indices so that they can navigate through

9   the mountains of discovery, good cause for a continuance exists

10  and is brought about by the state of discovery throughout the

11  prior fourteen months leading up to this request.  Defendants

12  are in no way on an equal playing field when it comes to

13  understanding what is contained in the discovery produced by the

14  government.  Defendants cannot be expected to move quickly

15  through discovery that took the FBI and prosecution team more

16  than fourteen months to process and produce.  In fact, in a

17  majority of pleadings and hearings in this case either this

18  Court, the United States, or the defendants have commented on

19  the enormity of the task of discovery.

20      Indeed, as the government has amply conceded: "The

21  government anticipates that there are certain initial issues,

22  such as discovery, suppression of evidence, *litigation of the*

23  *wiretaps*, motions to dismiss, that most, if not all, of the

24  defendants in this case will want to address ... the government

25  submits that it makes good sense for the Court to defer any

26  decisions on issues of severance and trial groupings until later

27  in the case when the charges are finalized, *the discovery has*

28

**LAW OFFICES**
506 BROADWAY
SAN FRANCISCO

1   *been digested*, and it is determined which defendants will

2   actually be proceeding to trial."[10] (Emphasis added)

3       Much can be learned about the challenges defendants face in

4   identifying relevant portions of discovery by looking to the

5   government's lack of enthusiasm for redacting documents in this

6   massive body of discovery.  The process of redaction is quite

7   similar to the process of evaluating discovery in anticipation

8   of a <u>Franks</u> hearing, especially when there is no road map or

9   index to assist counsel on where to begin.  First, one must

10   gather all of the discovery into a central location, determine

11   which files relate to a particular defendant, read, listen to,

12   or watch the discovery to find out which portions may be

13   relevant.  Particular words or events must be marked once they

14   are identified. Although defendants do not have the

15   technological challenges of carving out audio and video segments

16   for redaction, we have had a host of technological challenges

17   that the government has not faced including having to have audio

18   enhanced.

19       In the early stages of this case, the government argued

20   against being forced to redact discovery in the context of

21   moving for a protective order.  They wrote: [p]arsing out and

22   redacting the materials described above would be an enormous,

23   time-consuming, and expensive task for the United States to

24   undertake.[11]

25

26

    [10]     Docket 175, Page 5, lines 18-23.

27     [11]     Docket 279, Page 3, Lines 26-28.

**LAW OFFICES**
506 BROADWAY
SAN FRANCISCO

28

1    The Court sympathized with the government's position:

2    "[g]iven the volume of sensitive material and the fact that it

3    is so enmeshed with nonsensitive material, the protective order

4    negotiated between the government and all of the other

5    defendants in this case is both practical and appropriate. It

6    enables the defendants to have nearly immediate access to the

7    materials, which they may use immediately in the service of

8    their defense."[12] The volume of sensitive material compared to

9    the volume of information in discovery that pertains to our

10   clients is obviously minimal which has amplified the burden

11   placed on defense over the last fourteen months. Many of the

12   defendants are barely able to begin utilizing discovery in

13   defense of their client's as of the last few weeks.[13]

14        In addition to opposing redaction in an August 2014 hearing

15   again related to the protective order, the government then

16   acknowledged that defendants were struggling to wade through

17   discovery and needed an index: "If anything, the fact that

18   numerous defendants have asked for a guide or roadmap to

19   discovery materials should be an indicator to the Court of the

20   vast amount of discovery materials at issue in this case."   The

21   government thereafter provided a discovery index narrowing down

22   the contents into categories of about one hundred (the one

23

24   _____

        [12]Docket 301, Page 3, lines 9-13.

25
        [13]Chow's counsel has been waiting ten months just to locate

26   recordings of conversations used by the government in support of
     detention so that the detention issue could be readdressed

27   because his counsel did not have the benefit of any discovery at
     that point. All recordings still have not been located.

LAW OFFICES
506 BROADWAY
SAN FRANCISCO

28

1  recently produced is approximately thirteen times more

2  specific).  Unfortunately it was of little use because it was

3  not specific.

4      Illustrating the present need for a continuance due to

5  ongoing obstacles in discovery review, on November 12, 2014,

6  defendants filed a Statement of Discovery specifically outlining

7  and addressing that the defense was hindered by the way

8  discovery was handled by the government.  The defendants wrote:

9  "the court should be aware that there is a lack of any

10  discernable organizational structure in the discovery files as

11  delivered by the Government to defense counsel. This

12  substantially impairs the ability to prepare defenses, conduct

13  investigation, and evaluate the merits of pretrial motions. This

14  will continue to cause unnecessary delay unless remedial

15  measures are taken."[14] The statement included the following

16  precaution: "Until the discovery is adequately organized, either

17  through disclosure of the Government's internal organization

18  structure or by the discovery coordinator's completion of an

19  index, the defendants run the risk of falling below

20  Constitutional minimum guarantees." [15]

21      The defense coordinator could not complete an index until

22  recently as well due to delays in the turning over of discovery.

23  No response was given by the government to the identified need

24  to assist defendants in locating discovery.  No index or roadmap

25

26      [14]    Docket 592, Page 1, Lines 22-28.

27      [15]    *Id*. At Pages 4, Line 24, to Page 4, Line 2.

28

LAW OFFICES
506 BROADWAY
SAN FRANCISCO

1  was given in response to that statement.

2        On April 30, 2015, at the request of defense counsel, the

3  United States finally agreed to provide a discovery index.  The

4  index has proved to be very helpful and it is appreciated.

5  There are still issues with discovery but the United States and

6  counsel for defendants seem to be working through those issues

7  at this time. Over the course of the last month defendants

8  counsel and staff have been moving through discovery as quickly

9  as possible and have made significant progress but most of us

10 are only in the beginning stages.

11                          **CONCLUSION**

12       For the reasons set forth herein, moving defendants request

13 that the July 7, 2015 hearing date on the <u>Franks</u> motion be

14 converted to a status conference to address the discovery issues

15 outlined herein, to set briefing schedules and hearing dates for

16 any discovery motions that may be required and to reassess the

17 filing deadline for the <u>Franks</u> motion and hearing date.

18

19

20    DATED: May 28, 2015        /s/ J. CURTIS BRIGGS
                                 J. TONY SERRA
21                               CURTIS BRIGGS
                                 GREG BENTLEY
22                               Attorneys for Defendant
                                 KWOK CHEUNG CHOW
23

24

25

26

27

**LAW OFFICES**
506 BROADWAY        28
SAN FRANCISCO